W. T. CARTER & BRO. et al. v. COLLINS et al. (No. 68.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 26, 1916. Rehearing Denied Nov. 23, 1916.)

1. BOUNDARIES ⬤⟿37(1) — SUFFICIENCY OF EVIDENCE—CONFLICTING SURVEYS.
A verdict finding no conflict between surveys *held* sustained by the evidence.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 184–189, 192, 194.]

2. BOUNDARIES ⬤⟿3(1)—DESCRIPTION—RELATIVE IMPORTANCE.
While ascertaining the surveyor's intention is the primary object in locating boundaries, it is a rule of evidence that calls for natural objects, artificial objects, and distance and course rank in the order given.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 3, 5.]

3. BOUNDARIES ⬤⟿3(3)—DESCRIPTION—ARTIFICIAL OBJECTS.
In a boundary location calls for natural or artificial objects prevail over those for course and distance only when they can be identified with reasonable certainty.
[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 6–19.]

4. ADVERSE POSSESSION ⬤⟿115(5) — SUFFICIENCY OF EVIDENCE—HOSTILE CHARACTER OF POSSESSION.
Where the wife of the record owner's lessee lived on the land after her husband's death, but did not claim title by adverse possession in a former suit to eject her, and certain of her children testified that she did not dispute her lessor's title, her hostile holding was a jury question.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 314, 697, 699, 700.]

5. LANDLORD AND TENANT ⬤⟿56(1)—HOSTILE HOLDING—LESSEE'S FAMILY.
Where the children of the record owner's lessee continued to live upon the land until date

of suit, they continued to hold under the lease although the original lessee had died.
[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 124.]

6. ADVERSE POSSESSION ⬤⟿80(2)—COLOR OF TITLE—DEEDS—SUFFICIENCY OF DESCRIPTION.
Under a statute requiring registration of the deed under which a claim by adverse possession is made, a deed not describing the land in fact nor according to the field notes claimed to be applicable thereto is insufficient.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 464, 465.]

7. ADVERSE POSSESSION ⬤⟿97—EXTENT OF POSSESSION—TRESPASSER.
Where the record owner's lessee resided upon the land, such lessee had constructive possession of the entire tract, and a trespasser could only disseise the true owner to the extent of his actual possession.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 537–541.]

8. APPEAL AND ERROR ⬤⟿1070(2)—HARMLESS ERROR—VERDICT—INCONSISTENT ANSWERS.
Where a record owner's lessee had constructive possession of an entire tract, inconsistent jury answers, regarding the adverse possession by a trespasser of a small portion, are immaterial, where such possession was claimed to establish title by adverse possession to the entire tract.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4232, 4233.]

9. PARTITION ⬤⟿4—ACT OF PARTIES—POWER OF ATTORNEY.
A power of attorney from one owning an undivided interest in property to the other part owner, in which the grantor described himself as the owner of a certain part thereof, is insufficient to establish a partition, where it is not shown that the power was accepted or acted on.
[Ed. Note.—For other cases, see Partition, Cent. Dig. §§ 6–12.]

10. APPEAL AND ERROR ⬤⟿843(2)—NECESSITY OF DECISION.
Where appellees are the record owners of real estate, it is unnecessary to pass upon their claim of title by adverse possession.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3331.]

11. ADVERSE POSSESSION ⬤⟿110(4)—PLEADING POSSESSION—SUFFICIENCY.
A plea of adverse possession of an entire tract and a specific portion thereof is insufficient to raise the question regarding another specific portion.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 644, 645.]

Appeal from District Court, Polk County; L. B. Hightower, Sr., Judge.

Trespass to try title by V. A. Collins, Robert Dunham, and Mrs. Mary Colville against W. T. Carter, E. A. Carter, and Jack Thomas, a copartnership doing business under the name of W. T. Carter & Bro. and Thompson-Tucker Lumber Company. Judgment for plaintiffs, and defendants appeal. Affirmed.

S. H. German, of Livingston, and Townes & Vinson and Baker, Botts, Parker & Garwood, all of Houston, for appellants. W. D. Gordon, V. A. Collins, and Thos. J. Baten, all of Beaumont, and J. L. Manry, of Livingston, for appellees.

---

⬤⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

CONLEY, C. J. This was an action of trespass to try title brought by appellees, V. A. Collins, Robert Dunham, and Mrs. Mary Colville, against W. T. Carter & Bro., a partnership composed of W. T. Carter and E. A. Carter and Jack Thomas, and also against the Thompson-Tucker Lumber Company, a private corporation, to recover all of the Thomas Colville league of land in Polk county, save and except a strip 1,000 varas wide by 5,000 varas long off of the southwest portion of the league, known as the "1000-vara strip." The title to a tract of 320 acres known as the "Handley tract" in the east corner of the Colville league, claimed by appellants in their answer, was conceded to be in appellants, and judgment was accordingly rendered in their favor, and that tract is therefore not involved in this appeal. Appellants, in addition to their pleas of general denial and not guilty, disclaimed any interest in or title to the Thomas Colville league, save and except whatever part thereof might be included within the following boundaries, the same being referred to as the Bartolo Escobeda league of land, title to the said Bartolo Escobeda being issued on the 22d day of June, 1835, and which they described as follows:

"Beginning at the most northern corner of the Lowry T. Hampton league survey, from which a white oak 20 inches in diameter bears south 47 east 8 varas distant and another white oak 18 inches in diameter bears south 1½ west 7 varas distant; thence north 45 east 5,000 varas to a corner from which a pine 15 inches in diameter bears south 80 east 4 varas, and a black oak 15 inches in diameter bears north 2½ west 11.1 varas distant; thence north 45 west 5,000 varas to a corner, from which a cotton wood 14 inches in diameter bears north 14 east 13.2 varas distant, and a black oak 20 inches in diameter bears south 80½ west 9.1 varas distant; thence south 45 west 5,000 varas to corner; thence south 45 east 5,000 varas to the beginning, containing one league of 4,428 acres of land."

As to the land included within the above boundary, the appellants pleaded title by legal conveyances from the sovereignty of the soil, and also pleaded 3, 5 and 10 years' statutes of limitation. The case was tried with a jury, and was submitted on special issues, upon the answers to which the court entered judgment in favor of appellees for all of the Colville, except the Handley 320-acre tract, and the 1,000-vara strip above referred to. In due time appellants filed their motion for a new trial, which was overruled, and an appeal was perfected to this court.

The principal questions to be determined upon this appeal are as follows: First. Do the Escobeda and Colville leagues conflict? Second. If they do not conflict, have the appellants perfected title to the Colville land by virtue of the statutes of limitation, under deeds and muniments of title describing the identical land? Third. If the Escobeda and Colville leagues do not conflict, and appellants are not entitled to recover under their pleas of limitation, are not appellants entitled to recover the Tom Kinard 140-acre tract by virtue of the statute of limitation?

It is conceded that the appellants have title to the Escobeda league, and the appellees have the record title to the Colville league, except the Handley 320 acres and the 1,000-vara strip, and that the Escobeda is an older grant than the Colville.

In the solution of the issues involved, the first question presented for consideration is, Do the Escobeda and the Colville leagues conflict? The jury found that they do not conflict. But the appellant contends: First, that the undisputed evidence showed that the two leagues were located in conflict, except as to the 1,000-vara strip off of the southwest portion of the Colville league; and second, that it was therefore error not to submit the issue of conflict to the jury, as was done by the trial court; and, third, that the findings of the jury that the two leagues were not in conflict is contrary to the undisputed evidence, or, at least, contrary to the great preponderance of the evidence, and should therefore be set aside.

These contentions are embraced in appellants' first five assignments of error. The ultimate effect of these assignments is to raise the question that the verdict of the jury on the issues of boundary is not supported by the evidence, and that the charge of the court submitting such issues is not sustained by the facts of the case, and we will discuss the subject from such viewpoint, without treating seriatim each assignment of error as found in the brief.

The Bartolo Escobeda league was originally surveyed by S. C. Hirams, the field notes bearing date March 31, 1835, same being as follows:

"XBD Title June 30, 1835, Vol. 20, p. 583, Polk Co. XBD V 83.

"Field notes of a league of land surveyed by Bartolo Escobeda on the east side of Trinity on the branch of the Neches called the Big Sandy. Beginning at the northwest corner of league No. 2 surveyed for Lowry T. Hampton mound and stake, from which a black oak 20 inches in diameter bears south 47 deg. east 8 varas dist. also a white oak 18 inches in diameter bears south 1½ deg. west 7 varas distant, thence north 45 deg. east 2430.3 varas Big Sandy running south 15 varas wide, 5000 varas, made a mound and planted a stake, from which a pine 15 inches in diameter bears south 80 deg. east, 4 varas distant; also a black oak 15 inches in diameter bears north 2½ deg. west 11.1 varas distant. Timber, Pine, oak, elm, hackberry and hickory, undergrowth cane, sassafras and myrtle, some overflow and the land on the west side rich and fertile, but on the east mostly poor sandy land; thence north 45 deg. west 580.5 varas, pine 20 inches in diameter, line tree, 5000 varas, mound and stake, third corner, from which an elm 14 inches in diameter bears north 14 deg. east 15.2 varas distant, also a black oak 20 inches in diameter bears south 80½ deg. west 9.1 varas distant. Timber principally pine, undergrowth myrtle, cypress and paw paw; thence south 45 deg. west 385 varas, pine 18 inches in diameter, line tree 543.5 varas, black oak 18 inches in diameter, line tree, 4250 varas Big Sandy, 5000 varas mound and stake, fourth corner, timber pine, oak, hickory, and

hackberry, undergrowth, myrtle, peach and cane, land generally rich and fertile. Thence south 45 deg. east 5003.5 varas, fell 4½ varas south of the place of beginning, timber of a good quality, pine, oak, magnolia, beech and land rich, north 45 deg. west on true line, 5003.5 varas to the fourth corner, containing one league, about 7 labors of good farming land.

"S. C. Hirams, Surveyor,
"March 31, 1835."

This surveyor surveyed the Juan Falcon on the same day. The Thomas Colville was surveyed on June 24, 1835. The Lowry T. Hampton on March 14, 1835, the A. Wiley on June 24, 1835, the Henry Cone on the ——— day of ———, 1835, the A. Emanuel on June 24, 1835, and the F. Castanado on June 1, 1835. These are all adjoining surveys and their location, as well as other matters hereinafter referred to are shown on the following map:

The field notes of the Colville are as follows:

"XBD Title Aug. 30/35 Vol 21 p 815 Polk Co. XBD V 115

"Field notes of a League of Land surveyed for Thomas Colville on Big Sandy. Beginning at the S W corner of a league surveyed for Doctor Cone.

"Thence: N 45 E 340″ Branch bears S 10E 580″ branch bears S 25 E, 1195″ Spring branch bears S 80 E 3280″ Creek 8 varas wide bears S 10 E 5000″ 2nd corner from which a pine 30 in di bears N 30 W 9 varas dist also a White Oak 8 in di bears N 53 E 13.1 varas dist. Oak, ash, hickory, sugartree, magnolia and some pine timber. Undergrowth Cane, dogwood & Myrtle, Land fertile.

"Thence S 45 E 830″ Big Sandy, 900″ Big Sandy again, 999″ Big Sandy again 8 varas wide Bears South 2180″ beautiful spring, 2980″ trace leading from the lower village on Trinity to the prairie or Alabama Village on the Naches, 4096″ creek 3 varas wide bears S 40 E, 4910 spring

branch, 5000″ 3rd corner from which a beach 1S in di bears S 11 E 13.1 varas dist. Also a red oak 10 in di bears S 62 deg. 30′ E 5 varas dist. Oak, ash, beach, magnolia and pine undergrowth cane dogwood & myrtle, land rich.

"Thence S 45 W 4250″ Big Sandy 10 varas wide bears S 8 E 5000.5 4th corner, oak, ash, sugartree and pine timber, Undergrowth cane, dogwood & myrtle, land rich.

"Thence on random line, or along the Eastern boundary line of league 5000″ to the place of beginning, containing one league of about 6 labors of farming land.

"June 24th, 1835 Notes Sent S. C. Hiroms."

The great preponderance of the evidence in this case establishes the fact that the Thomas Colville league was actually located on the ground as shown in the above plat. Several of the corners were identified by original witness trees still standing, and the lines running out from these corners fit calls for most of the natural objects called for in the field notes, although some of the streams crossing its lines are misnamed. The field notes of the Andrew Wiley, dated June 24, 1835, and made by the same surveyor who located the Thomas Colville, call for the southeast corner of the Thomas Colville, and ties said survey to its southeast corner. The Colville field notes have their beginning corner at and called for the Cone league. The beginning corner of the Colville is as follows:

"Beginning at the southwest corner of a league surveyed for Doctor Cone."

There is no question about the location of the Cone league. The A. Emanuel calls to begin at this corner of the Cone.

[1] The undisputed evidence shows that the L. T. Hampton league is located just as it is found on the ground, and as it is placed in the above map, and yet, the surveyor who did the work, in surveying the Hampton league, made an error in his very first call; beginning on the east bank of Big Sandy creek, the field notes call is "Thence south 45 deg. east 2,500 varas," when, in fact, it should be "south 45 deg. west, 2,500 varas." In this same survey the third corner is tied to Big Sandy creek "south 45 deg. east 2,430 varas," when the distance, as found on the ground from this corner of the league, is 2,660 varas. These discrepancies are not the only evidence of loose and inaccurate work on the part of this surveyor. Aside from the uncertainties affecting the location of the land involved in this suit, a number of the other adjacent surveys, made approximately at the same time, contained more or less inaccurate calls. The western corner of the Hampton is designated as the "northwest corner." The southern corner of the Cone as the "southwest" corner, and the eastern corner as its western corner. As a matter of fact, his calls for adjoining and contiguous corners are nearly all misnamed, and called northwest for north, southeast for south, northeast for east and northwest for west.

Although the Escobeda and Falcon surveys were made on the same day, by the same surveyor, Hirams, yet a literal construction of the field note calls of these two surveys, and constructing the Escobeda by course and distance from the beginning corner called for, places said surveys in conflict, and rests one upon the other. The General Land Office maps for 1841 and 1856, in evidence, so place these surveys.

If the Escobeda is located on the Falcon, it would not touch Big Sandy creek. In the field notes of the Escobeda, Big Sandy creek is a prominent feature in the various calls. It is clearly shown by the evidence that Big Sandy creek has not changed its course since these surveys were made. The Escobeda cannot be located so as to touch Big Sandy creek at any point, if it is placed in conflict with the Falcon. Therefore, it is illogical to assume that it was the purpose or intention of the surveyor to locate said league where the Falcon is located. To arrive at the intention of the original surveyor in the matter of locating the Escobeda, it is evident that some change has to be made and substituted in the field notes of that league. To locate the league on the ground, it would be necessary, therefore, to look to the field note calls for natural and artificial objects, and, if possible, to find and identify them on the ground.

The north corner of the Hampton and the south corner of the Escobeda are coincident points, and call for the same witness trees. These trees have been found and identified on the ground. The evidence shows that both the appellants and the appellees are practically agreed that the beginning corner of the Escobeda, as fixed in its field notes, should be ignored. The northwest corner of the Hampton, and such beginning corner made to start at the north corner of the Hampton. The charge of the court so instructed the jury, and there is no complaint on either side to the charge, in this respect.

Although the appellants are willing to concede this change, and substitution in the field note calls of the Escobeda, they are not willing that any further change or substitution be made. From that beginning point, it is their contention that the Escobeda league must be constructed by course and distance, literally, in accordance with the field notes. While, on the other hand, it is the contention of appellees that if the league is so constructed it may be in accordance with the field notes calls for course and distance, it is inconsistent with the field note calls for the natural objects found and identified on the ground, and therefore the calls for course and distance must give way to the calls for such natural objects, and the league constructed accordingly.

In 1860 Gee, a county surveyor of Polk county, made a resurvey of the Escobeda, and returned his field notes to the General Land Office, for the first time placing the land in conflict in General Land Office with the Thomas Colville, by making its beginning

point the north corner of the Hampton, and constructing it solely by course and distance therefrom. It appears from these field notes and the certificate attached by him thereto that in making the resurvey, he found not a single bearing tree or line tree called for in the original field notes, except the ones called for at the north corner of the Hampton, and the south corner of the Escobeda. This is rather significant, since the survey at that time was only 25 years old, and the witness trees, as called for in the field notes, if they were on the land, in all probability should have been standing. He does state, however, that in running north 45 degrees east, he found a marked line, and at a point 5,000 varas he made a corner "on an old marked line that does not continue beyond the corner." The importance of these facts are materially reduced when we remember that the line he is referring to is a coincident line with the Colville and the Wiley surveys, both of which were made in 1835, and that this line is the only one of the Escobeda which both parties practically agree was actually surveyed when the league was located; the appellants contending that it constitutes the east line of the Escobeda, and the appellees that it is the west line of the Escobeda. The surveyor Gee also states that in running the line north 45 degrees west 5,000 varas from the north corner of the Escobeda, as located by him, he made "a corner on an old line." This point is located on the coincident line of the C. W. Thompson survey made in 1850, and for this reason the circumstance is not of great weight.

In constructing the Escobeda league from the beginning point at the north corner of the Hampton by course and distance, not a natural object called for in the field notes can be made to fit, as they are found and located on the ground. From the beginning corner, the first course is "north 45 degrees east 2430.3 varas, Big Sandy creek running south, 15 varas wide." On such course Big Sandy creek is found at 756 varas, and its course is almost east and west. On this same course what is known as Bear creek is reached at a point, according to appellees' evidence, at 2,476 varas, and is 9 varas wide, and crosses this line in an almost easterly and westerly direction. It is the contention of appellants that the surveyor Hirams, in the Colville field notes, called Bear creek "Big Sandy," and that, allowing for this error in name, and designating Bear creek "Big Sandy," as Hirams evidently thought it was, this natural object is found within 45.5 varas of the distance called for in the field notes. In response to this proposition, however, appellees urge: That the field notes call for a creek 15 varas wide, and that Bear creek at this point is only 9 varas wide, and that at the concluding corner of the first course of the Escobeda, the field notes describe the land adjacent to the corner on that line as follows:

"The land on the west side rich and fertile, and on the east mostly poor sandy land."

That if the line be extended north 45 degrees east 5,000 varas from the north corner of the Hampton, the soil is rich and fertile all the way through, and that there is found no such contrast in the nature of the soil at the south corner on this course as the field notes call for.

Much evidence is found in the record that if this call be reversed so as to run from the north corner of the Hampton south 45 degrees east, 5,000 varas, a corner will be established so as to fit the nature of the soil called for, and that the field note call for the natural object "Big Sandy, running south 15 varas wide," will be complied with, as the same is actually found on the ground. And, in this connection, they urge that the fact that Big Sandy on this course is located on the ground 2,660 varas from the north corner of the Hampton, instead of 2,430.3 varas, does not mitigate against the force of their contention, since the appellants concede that the Hampton league is properly located on the ground, and that the same error in calling for the distance of Big Sandy creek from the north corner of that league is made; such field notes designating this creek to be located at 2,430.5 varas.

It is to be noted that the third course of the Escobeda calls to cross Big Sandy again at 4,250 varas south 45 degrees west from the third corner, which corner, according to the contention of appellants, as they located Escobeda, is the north corner. This creek is actually found on the ground 2,780 varas from said corner, a variance in the field note calls of 1,170 varas. The appellees assert, and the evidence shows that if the Escobeda be constructed as the appellees contend it should be, and the third course call be substituted for the fourth course, that is to say, if the distance south 45 degrees west 4,250 varas be run from the north corner of the Escobeda, as they locate it, Big Sandy creek is found on the ground to be an exact fit to the call for course and distance.

Running north 45 degrees east from the eastern corner of the Hampton, there is no marked line. The eastern corner of the Hampton is in a cleared field. At a distance of 5,000 varas from that corner in that course, the bearing trees given for the third corner of the Escobeda are not found. But, it is the contention of appellees that the surveyor Hirams surveyed only two lines of the Escobeda, as they locate it, and that he made random calls for the other lines. That these two lines are as follows:

"One of them is the line called for in the Escobeda field notes to run south 45 degrees west 4,250 varas, Big Sandy, 5,000 varas, mound and stake * * * timber pine, oak, elm, hackberry and hickory, undergrowth cane, sassafras and myrtle, some overflow and the land on the west side rich and fertile, but on the east mostly poor sandy land."

This is the west line of the Escobeda, as appellees contend it should be located. In transposing the field note calls for the third course and substituting it for the fourth course, the original calls in the Escobeda field notes fit the ground with exactness on this line. The other line, which they contend was surveyed, is the one running south 45 degrees east from the north corner of the Hampton, and crossing Big Sandy 15 varas wide, at exactly the same distance (less a half vara) that the Hampton crosses it. The evidence shows that this line of the Hampton is vouched for by all the witnesses who testified in the case.

It is further earnestly contended by the appellees that since the league is a rectangle, and two of its converging base lines have been found and identified on the ground, they have in fact located the league; the construction of the other lines being a mere mechanical process in making the application of the calls for course and distance in the field notes. It is to be seen that if the Escobeda league is located as contended for by the appellees, it places it out of conflict with the other leagues and surveys, all of which were made by the same surveyor, and within a very short period of each other, and acquits the surveyor of doing an irrational thing, that of surveying one league upon another, when it was his official duty to locate the survey upon vacant domain, and without any intervening vacancies.

These were all issues for the jury to determine from the evidence submitted to them, and, having determined them adversely to appellants, and their findings being amply supported by the evidence, it is not the province of this court to disturb them.

[2, 3] It is the law of this state that where natural objects, as called for in the field notes, can be actually found and identified on the ground as showing the footsteps of the surveyor, both course and distance, when inconsistent therewith, must give way and be disregarded. Urquhart v. Burleson, 6 Tex. 502; Browning v. Atkinson, 37 Tex. 660. The courts of this state have undertaken to grant the dignity of calls in field notes, and to attach to them different degrees of importance. The first in importance are natural objects, such as streams, hills, mounds, nature of soil, etc. Next in importance are artificial objects, such as stakes, mounds, marked trees, etc., and the least of all, course and distance. This classification and grade of calls, however, is only a rule of evidence. The primary purpose in all cases of the kind is to locate the survey as it was intended to be located on the ground by the original surveyor, and if this can be accomplished with more certainty under the circumstances of the case by the calls for course and distance, they will control. It has been determined, however, that only when the natural or artificial objects called for in the field notes can be found and identified on the ground with reasonable certainty will they control calls for course and distance. Browning v. Atkinson, 37 Tex. 660; Railway Co. v. Anderson, 36 Tex. Civ. App. 121, 81 S. W. 781; Sloan v. King, 33 Tex. Civ. App. 537, 77 S. W. 48; Goodrich v. West Lbr. Co., 182 S. W. 341, where a general review of many of the decisions on that point will be found.

The charge of the court in submitting these issues contained a correct statement of the law for the guidance of the jury.

Appellants contend that they are entitled to a reversal of this cause under the principles announced in the Goodrich Case, supra, but there is a pronounced difference between the facts of that case and the present one. In the Goodrich Case, the court said:

"To our minds, nothing has been found of sufficient gravity to arrest the distance. No tree has been found, or bearing tree, called for in the original field notes. The surveyor does not say that any line was marked, but the contention is made that the old line, found running south 47 degrees east, is the east boundary line of the grant. The objection to this—and we think that same is conclusive—is that to accept this old line does not satisfy the quantity of land; that the length of the line is not satisfied; that no landmark referred to by the original surveyor can be found; and that in addition this old line, claimed to be the eastern boundary line of the grant, is found to extend only about two-thirds of the way across the four-league grant, or to about the Beasley corner, and cannot be found running any further south, although its course, as testified to, runs through virgin timber. * * * Therefore we are persuaded to believe" that nothing has been found "to arrest or stop the north or northwest line of this grant. * * *"

In the present case, the field notes of the Escobeda contain calls for natural objects, and the evidence in the record contains facts upon which the jury were justified in determining that such natural objects were found and identified on the ground, so as to fix and locate the Escobeda league contrary to some of the calls for course and distance. Appellants' assignments of error 1 to 5 are therefore overruled.

[4] Under assignments of error 6, 7, and 8, appellants contend that the court erred in not rendering judgment for them for the land sued for, under the five and ten years' statutes of limitation, the jury having answered that they, appellants, had held peaceable and adverse possession of the land in question for a period of more than 5 years, and more than 10 years before the filing of this suit, cultivating, using, and enjoying the same under deeds and memoranda of title, by and through their respective tenants, John Johnson and George Baptiste. The appellees in this case are, of course, claiming the land in controversy under the Colville title. The evidence shows that on the 15th of October, 1857, William T. Colville, a son and only heir of Thomas Colville, the original grantee of the Colville league, entered into a legal contract of lease with Thomas P. L. Kinard, as follows:

"Know all men by these presents: That I, Thomas P. L. Kinard, of the county of Polk, have this day rented of Wm. T. Colville of the county of Refugio and Orlando Dorsey the said Wm. T. Colville being the son and heir of the late Thomas Colville, the league of land known as the Colville league lying on the Big Sandy it being the same league that I have heretofore rented from the said W. T. Colville for the last four years and on which I now reside, and I undertake and promise the said Colville and Dorsey to keep the said league of land in good order and condition and to keep trespassers off of the same and to let such persons occupy the land as will hold under me as the tenant of said Colville and Dorsey and no others, and I also undertake to improve the aforesaid league to the best of my ability and to pay to the said Colville and Dorsey the sum of one dollars per year so long as this lease shall last and it is further understood that this lease shall be renewed yearly in the absence of which renewal through the oversight or other cause the same shall continue for longer period.

"In testimony whereof I have this day hereunto affixed my hand and seal this 15th day of Oct. 1857.          Thomas P. L. Kinard.
                              his
"Witness: D D X Kinard.
                  mark
"Oct 15th 1859. The above lease is this day renewed on the same terms and conditions for two years and it not then renewed for one year longer.              Thomas P. L. Kinard.
                              his
"Witness: D D X Kinard."
                  mark

This instrument was acknowledged by Thomas P. L. Kinard before the county clerk of Polk county on December 25, 1860, was filed for record December 26, 1860, and is recorded in Book I, page 105.

The evidence is undisputed that Thomas P. L. Kinard and his first and second wives, and some of his children have been in possession of this land ever since the execution of said lease, and up to the time of the filing of this suit. As to whether or not they were claiming adversely to the Colville title or in recognition of it was a sharply disputed question, and much evidence was introduced on the subject by both sides. Several of the sons of Thomas P. L. Kinard testified in the trial of the case to the effect that their father, and after his death their stepmother, as well as themselves, always recognized the Colville title to the land, and were holding under the claim which their father had. The appellants, on the other hand, introduced evidence to the contrary, and produced, among other things, a lease contract dated the ——— day of November, 1882, between Mary Kinard and the heirs of G. S. Thomas, appellants' predecessor in title, and also produced a certified copy of the pleadings in a suit of trespass to try title filed in the federal court at Galveston in 1885, by appellees' predecessors in title, against the said Mary Kinard, the widow of Thomas P. L. Kinard, and others, in which they allege that on January 1, 1883, the plaintiffs in that suit were lawfully seized and possessed of the Colville league; "that on the day and year aforesaid the said defendants and each of them entered upon said tract of land without any right or title, and ejected the plaintiffs therefrom,

and ever since then and until now unlawfully withhold from plaintiffs * * * the possession thereof." In this suit Mary Kinard filed an answer, consisting of demurrers and plea of not guilty. She did not set up any adverse title by limitation.

On the question of repudiation of the Kinard tenancy, the court submitted the following question to the jury:

"Issue No. 10. After the death of Thomas P. L. Kinard in 1870, and up to January 1, 1883, did or did not Mary Kinard occupy the Colville land under the tenancy contract between Thomas P. L. Kinard and Dorsey and Colville? Let your answer be, 'She did,' or, 'She did not,' according as you find the facts to be."

The jury answered, "She did." This being a question of fact which has been settled adversely by the verdict of the jury, there is no basis for appellants' claim that the court should have entered judgment for them under the Kinard tenancy.

[5] Upon this finding of the jury and the other practically undisputed evidence it follows that when Thomas P. L. Kinard became the tenant of Colville and Dorsey on the Colville league, that relationship continued between the parties and their privies up to the filing of this suit, there being ample evidence to support the theory that Mary Kinard and some of the children of Thomas P. L. Kinard, while always residing upon the land, gave full recognition to the tenancy of Thomas P. L. Kinard, and never held or claimed the land adversely to the Colville title. Hence the Kinard family were the tenants of the appellees and their predecessors in title from the date of the establishment of the Thomas P. L. Kinard tenancy up to the filing of this suit. Mattfeld v. Huntington, 17 Tex. Civ. App. 716, 43 S. W. 53; Oury v. Saunders, 77 Tex. 278, 13 S. W. 1030; Fowler v. Simpson, 79 Tex. 611, 15 S. W. 682, 23 Am. St. Rep. 370; Flanagan v. Parson, 61 Tex. 302; Cobb v. Robertson, 99 Tex. 138, 86 S. W. 746, 87 S. W. 1148, 122 Am. St. Rep. 609.

[6] On the 17th day of March, 1884, John B. Johnson executed a lease contract to the heirs of G. S. Thomas, appellants' predecessor in title. This contract contained the following description of the land leased:

"4,428 acres of land, being the B. Escobeda league situated in Polk county, state of Texas, and for description reference is here made to the title to said league in the said B. Escobeda."

John B. Johnson testified that he lived on the land from the fall of 1877 up until the fall of 1887, and that he was on the land about 3 or 3½ years after he signed this lease. The contract also contained a provision that his tenancy commenced on October 25, 1882.

The court submitted to the jury the question of whether or not Johnson had peaceable and adverse possession of the land described in appellants' answer, cultivating, using and enjoying the same continuously for a period of five years as a tenant of Thomas' heirs, while they claimed under a

deed, or deeds, duly registered, describing the land and paying taxes thereon during said period, and the jury answered in the affirmative. An examination of the record discloses the fact that not until February 21, 1907, in a deed made by Seth Grosvenor to W. S. Carlisle, one of appellants' predecessors in title, was there any deed or lease in appellants' chain of title attempting to describe the land claimed by appellants in any other way than by the description given in the original grant, which description, as heretofore stated, placed said league in conflict with the Falcon, and in no manner in conflict with the Colville. The Gee field notes of the Escobeda, which place it in conflict with the Colville, although made in 1860, were not used in any of the leases or deeds in appellants' chain of title until the execution of the Carlisle deed above mentioned.

The object desired in requiring the registration of deeds under the plea of 5 years' limitation is to give notice to the owner of the land that persons in possession of it are claiming adversely to them, and, of course, this object will not be obtained unless the description of the land is such that it would indicate the land being claimed. Mistake in the name or number of the survey upon which the land may be situated, however, would not necessarily render the deed ineffective under the plea of 5 years' limitation, if there be cause for external objections, which definitely fix and designate the land, or if it be otherwise described so as to identify it with the land owned and claimed by the real and true owner. Randolph v. Lewis, 163 S. W. 647; Udell v. Peak, 70 Tex. 547, 7 S. W. 786; McCurty v. Locker, 2 Tex. Civ. App. 220, 20 S. W. 1109; Basham v. Stude, 128 S. W. 662; Stout v. Taul, 71 Tex. 438, 9 S. W. 329; Cleveland v. Smith, 156 S. W. 247; Griffin v. Houston Oil Co., 149 S. W. 567; Clifton v. Creason, 145 S. W. 323; Eastham v. Gibbs, 58 Tex. Civ. App. 627, 125 S. W. 372.

The field notes contained in the Johnson lease nor in any of appellants' recorded deeds during the continuation of the tenancy created by said lease do not embrace the land included in the Colville league, nor are they to be identified with the field notes made by the surveyor Gee, which field notes appellants adopt for the land claimed by them in their pleadings, under the 5 and 10 years' statutes of limitation.

Johnson further testified to having made another lease contract on September 1, 1909, with W. T. Carter & Bro. and Thompson-Tucker Lumber Company. This contract is not copied into the record. It appears from the transcript of the pleadings in this case that the present suit was filed on June 3, 1914, and therefore appellants could not perfect title by limitation under the 5 years' statute based on the latter lease. For the reasons herein stated, the Johnson tenancy did not perfect title by limitation to the land under the 5 years' statute.

[7, 8] On the 14th day of June, 1885, George Baptiste and others entered into a lease contract with the heirs of G. S. Thomas and others, in which the land leased is described as follows:

"The league above mentioned is thus described: Beginning at the northwest corner of the Lowry T. Hampton league; thence north 45 deg. east (most eastern corner of league) 5,000 varas, thence north 45 deg. west (most northern corner) 5,000 varas; thence south 45 deg. west (most western corner) 5,000 varas, thence south 45 deg. east (most southern corner) 5,000 varas, and for more particular description reference is made to the grant to Bartolo Escobeda on the 22d of June, 1835, and the field notes of said survey now shown by certified copy on file in the county clerk's office, Polk county. The survey was made by S. C. Hirams, March 31, 1835."

There is testimony in the record showing that Baptiste lived on a small tract of the Colville for a great many years, and that he cultivated 8 or 9 acres thereof continuously for 34 years. There is also evidence in the record that George Baptiste was also a tenant of appellees' predecessors in title under an agreement made with Judge Crosson, who, it is claimed, was acting for appellees' predecessors in title in making said lease contract. Issues 8 and 9, submitted to the jury by the court, cover the question of perfection of title by limitation by the appellants under the 5 and 10 years' statutes, based upon the Baptiste tenancy, and these two issues were answered in favor of the appellants. In issue No. 11 the court submitted to the jury the question of whether or not George Baptiste held possession of any part of the Colville league under any contract of tenancy with appellees' predecessor in title, and, if they found such a contract of tenancy, whether it had ever been repudiated. In answering this question, the jury found that such a contract of tenancy existed, and that it had never been repudiated.

The answers of the jury to these three questions are inconsistent and contradictory, and this is made the subject of attack under appellants' fourteenth assignment of error. However, under the view we take of appellants' limitation issues generally, such error is immaterial, and will not affect the disposition of this case; the jury having found that the Kinard lease executed to William Colville et al. in 1853 had not been repudiated by his widow, Mary Kinard, and the evidence being undisputed that some member of the Kinard family has lived on the Colville league continuously up to the time of filing of this suit, as the tenant of the true owners. Such possession of the tenants drew to the real owners the constructive possession of the entire survey, and therefore Johnson and Baptiste, conceding that the latter was the tenant of the appellants, and that all the leases and deeds in appellants' chain of title had used such description of the land affected as to actually place it in conflict with the Colville, were still trespassers upon

'the land, and their possession must be restricted to that portion of the Colville survey actually reduced to possession. A trespasser entering under such circumstances can only disseize the true owner to the extent of the actual ouster. Whitehead v. Foley, 28 Tex. 284; Evitts v. Wroth, 61 Tex. 84; Bowles v. Brice, 66 Tex. 730, 2 S. W. 729; Houston Oil Co. v. Frazier, 161 S. W. 20; Village Mills Co. v. Houston Oil Co., 186 S. W. 785. Assignments of error 6, 7, 8, and 14, therefore, are overruled.

[9] We do not find any merit in appellants' contention that there was a partition of the league of land between Wm. T. Colville and Orlando Dorsey in 1858 under the conveyance of Colville to Dorsey .of that date, and that the possession of Kinard was on that portion of the league owned by Dorsey, and that therefore the tenancy of Kinard could not affect the possession of Colville. Under all the conveyances between these two parties, including the conveyance of 1858 and the ones of 1862 and 1868, the interests conveyed are undivided interests, and do not describe any specific portions of the league. The recital in the power of attorney executed by Wm. T. Colville to Orlando Dorsey in 1860 that his (Colville's) interest was in the north half of the league is an ex parte statement on his part, and there is no evidence of acquiescence in this statement by Dorsey. The record does not show that Dorsey ever accepted the power granted in said power of attorney, or that he ever sold any interest in said league thereunder.

[10] We have deemed it unnecessary to go into appellees' proposition that they have also, in addition to the record title, acquired title by limitation under the 3 years' statute, by virtue of the Kinard tenancy, even conceding that there is a conflict in the Escobeda and Colville leagues, since we have found the record title to be in them.

The ninth assignment of error attacks the charge of the court in submitting special issue No. 11, that is the issue of tenancy of Baptiste with appellees' predecessor in title, because the proof is wholly insufficient to sustain it. The tenth assignment of error attacks the finding of the jury on this issue as contrary to the undisputed evidence. The eleventh assignment attacks the finding of the jury under said special issue No. 11 as being contrary to the great preponderance of the evidence, and on the ground that the jury was misled and actuated by passion and other improper motives. The twelfth assignment of error attacks the finding of the jury under said special issue No. 11, to the effect that the contract of tenancy had never been repudiated, as contrary to the undisputed evidence, and assignment of error No. 13 is that it was contrary to the great preponderance of the evidence. It follows from what we have said in passing upon the Kin-

ard tenancy with the Colvilles, and upon appellants' limitation pleas generally, that these assignments are nugatory, and they are therefore overruled.

Appellants' fifteenth assignment is based upon the alleged error of the court in overruling its motion for judgment in their favor for the 141 acres of land described in the deed from T. P. Kinard to Matthews, and from Matthews to appellants, W. T. Carter & Bro., for the reason, as they claim, that the · undisputed evidence shows that the appellants and those whose estate they have, have had ' possession thereof more than 5 years, under circumstances giving them title under the 5 years' statute of limitation.

The sixteenth assignment of error is based on the same proposition affecting their claim under the 10 years' statute of limitation.

[11] There appears in the record a deed from T. P. Kinard and wife to W. T. Carter & Bro., dated February 23, 1907, for the merchantable timber on 141 acres out of the Colville league, specifically described by metes and bounds. On the same day the same grantors executed a deed to J. H. Matthews for the same land as described in the foregoing deed, and Matthews on September 25, 1911, conveyed the same land to W. T. Carter & Bro. The evidence is undisputed that T. P. Kinard lived on this land for a great many years, and the evidence is probably sufficient to establish a limitation title thereto if the pleadings of appellants were in shape to support it. An examination of appellants' answer, in which the different statutes of limitation are pleaded, shows that there is no separate plea upon the part of appellants setting forth their claim to this particular tract of land. Appellants' plea of limitation covers the entire Escobeda league of land and a specific 320 acre tract included in what they claim to be the true boundary lines of the Escobeda. There is no attempt in the pleadings to set forth any claim to this specific tract of land under any of the statutes of limitation. Under such circumstances, the court did not err in refusing to enter judgment for said 141 acres. Houston Oil Co. v. Kimball (Sup.) 122 S. W. 533; Giddings v. Fischer, 97 Tex. 188, 77 S. W. 209.

Finding no error in the trial of this cause, the same is affirmed. '