George McNEELY, Appellant,

v.

SOUTHWESTERN SETTLEMENT & DE-
VELOPMENT CORPORATION et al.,
Appellees.

No. 5053.

Court of Civil Appeals of Texas.

Beaumont.

April 7, 1955.

Rehearing Denied July 7, 1955.

See 284 S.W.2d 167.

A. M. Huffman, Beaumont, for appellant.

Blades, Kennerly & Whitworth, Houston, Wheat & Wheat, Woodville, W. F. Nowlin, San Antonio, for appellees.

WALKER, Justice.

Plaintiff, Southwestern Settlement & Development Corporation, sued George McNeely in Trespass to Try Title to recover the surface estate in a tract of land, 31.28 acres in extent and a part of the BBB & C Rr. Co. Survey 120, Abstract 97, in Hardin County. McNeely answered and by cross action sued plaintiff and others for the title to the entire survey, less a tract of 44.28 acres in the southeastern corner which had belonged to J. H. Mc-

Neely and wife. There were other parties, but discussion of them and of the pleadings pertaining to them and discussion of the cross defendants' pleadings may be omitted. The cause was tried to a jury, and the trial court at the close of the evidence withdrew the case from the jury and rendered judgment in behalf of plaintiff and cross defendants that George McNeely take nothing as to his cross action, and that plaintiff have title to the surface estate and said cross defendants have title to the mineral estate, in the survey less the J. H. McNeely tract of 44.28 acres. From this judgment George McNeely has appealed.

George McNeely now claims title only to the 31.28 acre tract described in the amended petition, admitting that he showed no title to any other land on the survey, and his claim of title to the 31.28 acres is based on adverse possession by himself which, he says, complied with the ten year statute, Art. 5510, R.S.1925. He says that there is evidence that in April, May and June of 1937, he enclosed the 31.28 acre tract by a fence; that about five acres of this tract was then or a little later separately enclosed within this fence by a cross fence; that in 1937 he cultivated this five acres as a field and used the rest of the 31.28 acres as a pasture; and that for more than ten consecutive years thereafter he had exclusive and adverse possession of the 31.28 acre tract, lawfully maintaining the fence about it and using it as a pasture and sometimes cultivating the field just mentioned; and that the issue of title to the 31.28 acre tract by adverse possession ought to have been submitted to the jury. The evidence pertaining to the question of title by adverse possession supports this contention unless one or more of the appellees' counterpoints is valid, and we proceed, therefore, to discussion of these counterpoints.

Under Counterpoint 1 appellees contend that George McNeely was estopped to claim title by adverse possession because, as a matter of law, he entered and occupied the 31.28 acre tract as a tenant and never repudiated the tenancy.

George McNeely is a son of J. H. McNeely, whom we have mentioned above, and the 44.28 acre tract in the southeastern corner of the survey which we have referred to as the property of J. H. McNeely and wife was conveyed to J. H. McNeely in 1904. J. H. McNeely established his home on this tract prior to the birth of George McNeely in 1906, and he and his wife resided on this tract until his death in February, 1937. He died intestate, and his widow, the mother of George McNeely, survived him and succeeded to her community one half of the 44.28 acre tract and the title to the other one half of this land and of J. H. McNeely's estate vested in the heirs of J. H. McNeely under the statutes of descent and distribution. One of these heirs was George McNeely; and a few days after his father's death, he and his family established their residence in his parents' home, with his mother. There is evidence that afterward, in April, May and June of 1937, George McNeely did enclose the 31.28 acre tract with a fence and began to use it for a pasture and to cultivate a part of it as we have stated. His mother continued to reside with him and his family for at least a part of the time when, he said, he was erecting the fence around the 31.28 acre tract in suit, and thereafter she resided with him from time to time, spending a part of her time with him and part with other children of hers. The 31.28 acre tract adjoins the J. H. McNeely 44.28 acre tract at the northwestern corner and, from that corner, parts of the western and northern lines of the J. H. McNeely tract; and Mrs. J. H. McNeely must have known, at least, that George McNeely was making some use of the 31.28 acres in suit. There is no evidence that she ever objected to this and none that she affirmatively authorized it. At most, the evidence shows that she acquiesced in it.

During J. H. McNeely's lifetime and while he resided on the 44.28 acres, he enclosed a part of the survey outside of his 44.28 acres and used this inclosure as a pasture, and the 31.28 acre tract in suit is a part of this pasture. J. H. McNeely and

wife, on December 6, 1935, executed an acknowledgment of tenancy in behalf of the owners which covered all of the survey except their own 44.28 acres, and in this agreement declared that they then held possession of said property as tenants of the said owners, and the agreement authorized them to keep possession of the property and to use it for pasturage until their landlords requested them to leave the property.

■ This agreement created a simple tenancy at will. Appellees say that George McNeely inherited from his father a right under this agreement to enter and occupy the 31.28 acres in suit and that the possession claimed by him must be treated as only a continuance of the original tenancy under the rule stated in Flanagan v. Pearson, 61 Tex. 302; Juneman v. Franklin, 67 Tex. 411, 3 S.W. 562; Benskin v. Barksdale, Tex.Com.App., 246 S.W. 360; W. T. Carter & Bro. v. Collins, Tex.Civ.App., 192 S. W. 316, and similar cases.

■ Counterpoint 1 is overruled. The tenancy being only at will, the rights of J. H. McNeely ended at his death and did not pass to his heirs under the statutes of descent and distribution. Lea v. Hernandez, 10 Tex. 137; Carter v. Town of La Grange, 60 Tex. 636, at page 639. The tenancy must be proved as a matter of law to support the judgment and there is evidence that George McNeely did not intend or purport to enter or to occupy the 31.28 acres in suit under his father's right of possession. He testified that he did not know that his father and mother had signed an acknowledgment of tenancy and did not know that they considered themselves to be tenants. As we have stated, there is nothing to show that his mother gave him permission to occupy the land in suit, and it may be inferred from his testimony that he did not act by virtue of permission from any one. It was at least not proved as a matter of law that he did. While his mother must be taken to have known what he actually did, her unilateral acquiescence in his conduct could not make him a tenant. Then, there is evidence that his father's inclosure on the survey had ceased to exist and that his father's pasture had not been in use for more than a year before his father died, and the 31.28 acre tract in suit is only a part of the pasture of George McNeely's father. The jury could have found that George McNeely's entry and possession were new and separate and distinct from those of his father.

■ Counterpoint 2 is that George McNeely's claim to the land in suit "was not of such unequivocal notoriety as to charge the owners—with notice thereof." Most of the circumstances which appellees offer in support of this counterpoint tend only to raise questions of fact for the jury and need not be discussed. Others are referred to under counterpoints following.

Counterpoint 3 is that the evidence showed that within the period of adverse possession claimed by George McNeely, representatives and agents of persons to whom the owners had sold the timber on the 31.28 acres in suit entered upon said land and cut and removed timber therefrom, and so George McNeely's claim of exclusive possession was rebutted.

By an instrument dated July 26, 1943, the owners of that part of the survey other than the J. H. McNeely tract, conveyed to Hervey Lumber Company, a partnership of A. E. Hervey and T. F. Keasler, for two years, beginning January 1, 1944, the right to cut and remove certain pine timber on said land; and within this two years Shaver Brothers, a firm consisting of the witness G. F. Shaver and his brother, Mack Shaver, put a portable sawmill on the survey near an eastern or northern part of the fence claimed by George McNeely and outside of the J. H. McNeely tract but not far, perhaps half a mile, from the house on that tract, and cut timber over at least that part of the survey outside of the J. H. McNeely tract and outside of the 31.28 acres in suit, and sawed this timber and other timber into lumber and delivered it to Hervey Lumber Company, who paid them for their services. Under Hervey Lumber Company's timber deed, the timber cut from the survey in suit, less the J. H.

McNeely tract, purportedly belonged to said Lumber Company, and Shaver Brothers were acting in behalf of said Lumber Company in felling the timber and sawing it into lumber.

According to the witness G. F. Shaver, his firm, during the period mentioned, also cut timber inside the fence claimed by George McNeely and on the land in suit, and this was done without objection from anyone and under information from at least two persons, one an uncle of George McNeely who lived within a few hundred yards of the J. H. McNeely home, that the timber inside this inclosure belonged to the grantors of Hervey Lumber Company. Mrs. George McNeely's testimony shows that she knew of the presence of the mill and that she made no objections to its presence or to the operations of Shaver Brothers.

■ This statement shows the nature of the conduct constituting the basis of counterpoint 3. There is other evidence concerning this matter, some of it confirming appellees' position, but it is our conclusion that the evidence only makes a question of fact for the jury, whether Shaver Brothers entered the inclosure and cut timber therein as G. F. Shaver testified.

Counterpoint 4 also attacks George McNeely's claim of exclusive possession and for facts in support refers to the evidence of Shaver Brothers' cutting and removing timber from within the inclosure claimed by George McNeely and refers to other matters as well. The witness G. F. Shaver testified that the mill remained from four to six months at the site we have mentioned, and that he (or his firm) erected a corral at a water hole on the 31.28 acre tract in suit, and also erected two or three small houses on this land, and that while the mill was at this place he (or his firm) used the corral for work animals employed in the operations pertaining to the mill, and the houses were used as dwellings by workmen engaged in said operations. According to Mr. Shaver's testimony, corral and houses were inside the inclosure claimed by George McNeely, and although his tes-

timony as to how long the mill was at this place is not definite, it does show that the mill was there and that the operations conducted at or pertaining to this mill continued for a substantial period of time. There is other testimony concerning these matters and appellees argue that the evidence proved this conduct as a matter of law. However, it is our conclusion, as in the case of the claim that Shaver Brothers cut timber within George McNeely's inclosure, that whether Shaver Brothers had a corral and houses on the land in suit were questions for the jury.

Nevertheless, the evidence did prove as a matter of law that Shaver Brothers used a water hole on the land in suit, inside the inclosure claimed by George McNeely, to water their work animals and that this use continued for a substantial time. George McNeely was inducted into the army in November, 1943, and in 1944 was sent abroad and did not return to this country until, he said, in December, 1945. During this period of active duty which, he said, began in December, 1943, his wife and children resided with his wife's mother in Silsbee, some fifteen miles from the land in suit and the J. H. McNeely place where they had been residing, and Mrs. McNeely testified that while her husband was away she went to the land in suit at frequent intervals and inspected and sometimes patched the fence about said land and inspected and sometimes fed some cows belonging to her and her husband, which were kept in this inclosure. She said that she went up there to attend to the cows and to see that the fence was all right and that her husband told her to look after the fences, but she also said that she went up there to look after the property, including the land. George McNeely is claiming that his adverse possession extended through this period and it is necessary that he do so if his claim is to be made out. Accordingly, his wife must be regarded as his representative during his absence, to maintain and continue the possession which, he says, he had commenced, and the evidence summarized shows that she was to do this by using the inclosure as a pasture.

We have mentioned the testimony of G. F. Shaver, that the mill was situated for a period of four to six months at the site near the inclosure claimed by George McNeely. The said George McNeely himself testified that a small sawmill was operated on that survey "on the north side just out from my pasture", almost up against where that old pasture fence was; that a big pile of sawdust is there now; that there is plenty of evidence there to show that a sawmill was there; and further: "Q. Was there any evidence inside of that pasture fence to show that a portion of that inclosure was used as a corral? A. No, they cut my fence there and used my water hole."

This testimony was amplified by that of Mrs. George McNeely called as a witness by her husband. Mrs. McNeely testified on direct examination:

"Q. Mr. McNeely testified about finding a gap in the pasture when you moved back out there when he got out of service. (McNeely had testified to finding a hole in the fence about 30 or 40 feet wide, which he had had repaired by two negroes.) A. When they had a sawmill up there they cut a gap in the fence and used our water hole to water the stock and it wouldn't stay up.

"Q. What would you do with reference to that gap before you all went back up there? A. I would patch it up. It would keep the cows in.

"Q. Did it keep other cattle out? A. I never did see any other cattle in there.

"Q. What did Mr. McNeely do with reference to that gap after he got back? A. He repaired it.

"Q. How long was it before he repaired it? A. I don't know, but right away.

"Q. Do you know how long that gap had been in there? A. It hadn't been in there too long I don't believe because the cows hadn't strayed.

"Q. How often were you going up there? A. Every two weeks.

"Q. Do you know how long it had been there? A. No, sir, I don't. I found it one time when I went up there. I patched it up the best I could but it wouldn't stay up. (Testimony objected to and stricken).

"Q. I understand you found this gap one time when you were up there? A. Yes, sir.

"Q. Was it there when you were there before? A. No, sir, it was not.

"Q. How long was the longest time you were away from there? A. When my daughter was born.

"Q. How long were you away then? A. I don't believe over four weeks.

"Q. Was that when it was? A. I believe it was. I am not sure.

"Q. How long was the hole? A. One post was torn down or something. It was a pretty good size place. I tried to patch it up.

"Q. Did it stay patched up? A. I would check it every time I would go up there and sometimes it would be down and I would have to repair it.

"Q. You repaired it each time when you found it down? A. Yes, sir."

On cross examination, she testified:

"Q. You saw a sawmill on that land? A. I didn't see the sawmill but it was outside of the pasture. I knew it was there.

"Q. How far was that sawmill from the house on the J. H. McNeely land? A. I would say one-fourth of a mile. I can't judge distance.

"Q. How far was it from the pasture? A. Right at it.

"Q. You say you never saw the sawmill? A. Yes, I saw it.

"Q. What land are you and your husband claiming? A. The whole tract whatever it was—All the land on the BBB & C. Survey there.

"Q. When you found out there was a sawmill on that land, did you go up and question the sawmill people to see what they were doing on there? A. No.

"Q. Yet you say you are claiming all of this land on the BBB & C Survey, Section 120? A. Yes.

"Q. Weren't you looking after the land that you were claiming? A. My husband told me to look after the fences.

"Q. Didn't you go up there to look after your property, including the land? A. Yes.

"Q. And you went up there and found there was a sawmill there on the land that you claimed to be yours? A. Yes, sir.

"Q. Yet you didn't go out there and question the sawmill people about why they were there? A. No.

"Q. You say somebody cut a gap in your fence? A. Yes, sir, so as to carry stock in there and water them at the watering hole.

"Q. That was cut by the operators of that sawmill? A. I imagine so.

"Q. Did you go and say anything to them about your fence? A. No. * *

"Q. Do you know how long the saw-mill was in operation? A. No, sir, I don't know.

"Q. On how many trips were you up there when the sawmill was in operation? A. I don't know. I didn't keep a record of it.

"Q. Don't you have any idea the number of times that you saw the sawmill there? A. No. * * *

"Q. Mrs. McNeely, when you discovered there was a sawmill up there on this land you say you claimed, did you make any inquiry as to who owned that sawmill * * * who operated it or anything? A. No."

On redirect examination, she testified:

"Q. You didn't see who tore this gap in the fence? A. No, I didn't see them.

"Q. Do you know of your own knowledge that anybody carried their mules in there to the water hole? A. No, I don't. I just know there was a road beat out in there to the water hole.

"Q. When you testified that they brought mules in there to water them at that water hole, that was just your guess or supposition? A. Yes, sir, my supposition.

"Q. Was the sawmill on the land when your husband got back from the Army? A. I don't remember. I don't believe it was.

"Q. I believe you said you didn't know how long it stayed there? A. No, I don't."

On recross examination, she testified:

"Q. You say you didn't see anybody carry mules through that pasture to that water hole? A. No, sir, I didn't see them. I just supposed that they did for there was a road beat out to the water hole."

Mrs. McNeely's testimony about the intruding use of the sawmill operators may involve a supposition, but the circumstances on which her inference appears to be based were all in evidence and necessarily prove that her inference was right. For the mill was near the fence and the evidence shows that the survey was woodland, and there was nobody else except the sawmill operators to open the fence and use the water hole; and Mrs. McNeely's description of the trace to the water hole shows that it was made by livestock. Mrs. McNeely can be depended on to know that stock did make the trace to the water hole, for she had lived on the J. H. McNeely tract for years before her husband entered the army; she and her husband had livestock of various kinds at their place, cows, hogs and horses, and she would know the tracks made by such animals. Further; she testified that "there was a road beat out to the water hole", this road obviously did not end at the fence and Mrs. McNeely could see where it led.

■ It is held that the possession of the claimant of title by adverse possession must be exclusive during the period of possession claimed by him; and a substantial period of use by the owner, acquiesced in by the claimant, will interrupt a possession previously exclusive, because during this period the claimant's possession is not exclusive and so does not give notice that the possession of the claimant is adverse. Black v. Goolsbee, Tex.Civ.App., 226 S.W. 463; Southwestern Lumber Co. of New Jersey v. Allison, Tex.Com.App., 276 S.W. 418; Rick v. Grubbs, 147 Tex. 267, 214 S.W.2d 925, 927. In the last decision it was said: "An important part of the law as so stated is that the possession must be of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant. It follows that the law's requisites are not satisfied if the occupancy is shared with the owner or his agents or tenants."

■ It is held further that the entry of the purchaser of timber is that of the owner in whose right he claims. Coleman v. Waddell, 151 Tex. 337, 249 S.W.2d 912, and decisions cited, among them several by this court.

■ These principles apply here. Mrs. McNeely, really a claimant with her husband but left in charge and acting for him with reference to the possession of the land in suit, acquiesced for a substantial period of time in a material use of the land in suit by persons whose entry is to be identified in law with that of the owners whose rights they were asserting, and this intruding use was inconsistent in fact with that made by Mrs. McNeely and her husband and with their claim of adverse possession. Mrs. McNeely made no effort to resist or exclude the intruders or to interfere with them in any way. Her efforts to maintain the fence put up no bar to the use made by the other people and plainly were not intended to do so. All she did was to try to keep an inclosure for her own cows. We hold that the facts were sufficient to prove that the possession claimed by appellant ceased to be exclusive for such a time as tolled limitation. The question we have been most concerned with is whether Mrs. McNeely's testimony about the use of the land is sufficiently definite and detailed to prove the duration and the extent of the intruding use. The plaintiff alone has proved the existence, nature and purpose of the intruding use, and he will be charged here with having, in effect, adopted the testimony of his wife, which he proved and in all of which he has acquiesced. Mrs. McNeely's testimony about patching the hole in the fence from time to time, (she could not keep the fence up, and her husband had to repair the break in the fence after he returned from the army) with her testimony about the intervals between her trips to the land and with her description of the trace to the water hole as a "road", shows that the intruding use was continued for a substantial time, and it indicates that Mr. Shaver was right when he said that the mill was at the particular site for four to six months. We think that this item of Mr. Shaver's testimony can be taken as true and that it measures the duration of the intruding use. Mrs. McNeely twice testified that "a road was beat out to the water hole", and the word "road" necessarily implies a use made often enough to produce a "road", or Mrs. McNeely would have used another word. Such a use would be frequent and substantial. The evidence seems clearly enough to make an issue for the jury, whether the possession of George McNeely ceased to be exclusive for the time the intruding use was made, but we have concluded that it goes beyond this point and authorizes the instructed verdict against the appellant. Grantham v. Masonite Corp., 218 Miss. 745, 67 So.2d 727; Little v. Barbe, 195 La. 1071, 198 So. 368, at page 373 (Headnote 4).

Therefore, as regards the intruding use by the sawmill operation, which we have just discussed, we sustain Counterpoint 4, and also, on this ground, sustain Counterpoint 2.

Counterpoints 5 and 6 need not be discussed, but if it were not for the matters because of which we have sustained Counterpoint 2 and, in part, Counterpoint 4, the evi-

dence concerning the maintenance of the fence claimed by George McNeely would have raised a question for the jury under the rule stated in Burnham v. Hardy Oil Co., 108 Tex. 555, at page 569, 195 S.W. 1139, at page 1146; "Temporary breaks in the enclosure do not arrest limitation." See, also, the decisions cited by the Supreme Court in support of that statement, and see: Kane v. Sholars, 41 Tex.Civ. App. 154, 90 S.W. 937, at pages 939, 940; Dunn v. Taylor, 42 Tex.Civ.App. 241, 94 S.W. 347, at page 351; Kelly v. Wilson, Tex.Civ.App., 283 S.W. 696, at page 699; Ross v. Houston Oil Fields Ass'n, Tex.Civ. App., 88 S.W.2d 586, at page 594; Ogletree v. Evans, Tex.Civ.App., 248 S.W.2d 804.

The judgment of the trial court is affirmed.