IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 98-50582

———————————————

T T E A, A Texas Corporation

                                        Plaintiff-Appellant,

v.

YSLETA DEL SUR PUEBLO; JOSE G SIERRA, Presiding Judge of the Ysleta
Del Sur Pueblo; ANGELA R LUHAN, Associate Judge of the Isleta
Pueblo; THE TRIBAL COURT OF THE YSLETA DEL SUR PUEBLO

                                        Defendants-Appellees

———————————————

Appeal from the United States District Court
for the Western District of Texas

———————————————

July 19, 1999

Before POLITZ, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Today we again take up the long saga of this country's
relationship with Indian country, drawing on a body of law more
stable than the conflicting shifts in governmental policy on which
it lies--but bearing scars of these shifts in its own ambiguities.
TTEA, a Texas corporation, seeks to counter rulings of a tribal
court in its dispute with the Ysleta del Sur Pueblo Indian Tribe
over a contract.  We examine the jurisdiction of the district court
and of the tribal court, finding only the latter properly
exercised.

Under its contract with the Tribe, TTEA managed a smoke shop on the Pueblo's reservation in El Paso beginning on November 1, 1994. TTEA was responsible for improving, managing, operating, and marketing the smoke shop, and was obliged to pay the Tribe at least $3000 per month, depending on sales. The contract also gave TTEA a right of first refusal to sell gasoline products. The Tribe was entitled to terminate with thirty days notice only under certain conditions.

On April 14, 1997, six months before the contract would have expired, the governing body of the tribe, the Tribal Council, declared the agreement void. The Secretary of the Interior had never approved the contract, and the Tribal Council concluded that under 25 U.S.C. § 81, it was therefore invalid. Three days later, the Tribe filed a suit in tribal court seeking both a declaration that the agreement was void and a refund of money it had paid to TTEA. TTEA's answer denied the applicability of the statute and that the Tribe had paid it any money under the agreement. TTEA also filed a counterclaim, with most of the asserted damages attributable to an alleged breach of the right of first refusal to sell gasoline products; a motion to dismiss for lack of subject matter jurisdiction; and a demand for trial by jury.

Without a hearing, the tribal court entered an order. The order declared that the court had jurisdiction over the matter. It concluded that the contract was subject to § 81 and invalid because

it was not signed by the Interior Secretary. The court acknowledged that although the parties had not specified which party was responsible for obtaining approval from the Bureau of Indian Affairs, the greater share of the responsibility rested on the Tribe. Nonetheless, it held TTEA legally responsible.

TTEA petitioned for appeal in the tribal court, decrying the absence of a hearing or presentation of evidence. The tribal court, per the same judge who issued the initial ruling, vacated that ruling, but then concluded that there was no genuine issue of material fact about whether the contract was void, granted partial summary judgment to the Tribe on its liability claim, and dismissed all counterclaims. The court indicated that it would proceed to an evidentiary determination of the Tribe's remaining damage claims.

TTEA subsequently brought this action, claiming federal question jurisdiction. It requested that the district court retain jurisdiction over the complaint filed in the tribal court and enjoin its further prosecution. Further, it asked for a declaratory judgment that § 81 was inapplicable and that the tribe had violated its status as a tribe by illegally engaging in gaming operations, thus estopping it from asserting its § 81 defense. The Tribe moved to dismiss for lack of personal jurisdiction, for lack of subject matter jurisdiction, and for failure to state a claim.

The district court dismissed the action with prejudice. First, it dismissed defendant tribal court officials Jose G. Sierra and Angela R. Luhan, on the ground that those officials were acting

in their official capacities within the scope of their authority. Second, it found the tribe shielded from suit on the contract by the doctrine of sovereign immunity and that there was accordingly no subject matter jurisdiction. Third, it found TTEA without standing to complain of the Tribe's gaming activities.

TTEA filed a timely notice of appeal. Abandoning its gaming-related challenge, TTEA argues that the district court should have addressed the scope and applicability of § 81 and the subject matter jurisdiction of the tribal court.

## II

We begin, as we must, with the district court's subject matter jurisdiction. We agree that the Tribe has sovereign immunity from an award of damages only. We find, however, that the remaining claims have no jurisdictional support.

## A.

The Supreme Court recently held that, absent congressional abrogation, tribal sovereign immunity extends even to actions on contracts between the Tribe and others. See Kiowa Tribe v. Manufacturing Tech., Inc., 118 S. Ct. 1700 (1998). Though recognizing "reasons to doubt the wisdom of perpetuating the doctrine," id. at 1704, a six-Justice majority concluded that narrowing of tribal sovereign immunity should be left to Congress, see id. at 1705.

Kiowa, however, was an action for damages, not a suit for declaratory or injunctive relief. This difference matters. In

4

Puyallup Tribe v. Washington Game Department, 433 U.S. 165, 171 (1977), the Court reaffirmed that "whether or not the Tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members is permissible." Though the defendants in Puyallup were not tribal officials, the Court cited it the next Term in finding a tribal governor not immune from a suit seeking declaratory and injunctive relief against enforcement of a tribal ordinance. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59 (1978). Years later, Justice Stevens suggested that tribal sovereign immunity might not extend "to claims for prospective equitable relief against a tribe." Oklahoma Tax Commission v. Potawatomi Indian Tribe, 498 U.S. 510, 515 (1991) (Stevens, J., concurring).

The distinction between a suit for damages and one for declaratory or injunctive relief is eminently sensible, and nothing in Kiowa undermines the relevant logic. State sovereign immunity does not preclude declaratory or injunctive relief against state officials. See Ex Parte Young, 209 U.S. 123 (1908). There is no reason that the federal common law doctrine of tribal sovereign immunity, a distinct but similar concept, should extend further than the now-constitutionalized doctrine of state sovereign immunity. Cf. Seminole Tribe v. Florida, 517 U.S. 44 (1996). In any event, Santa Clara Pueblo controls. Thus, while the district court correctly dismissed the damages claim based on sovereign

5

immunity, tribal immunity did not support its order dismissing the actions seeking declaratory and injunctive relief.

B.

We would be obliged nonetheless to affirm the district court if it did not have subject matter jurisdiction over TTEA's equitable claims. Of course an absence of immunity does not ensure jurisdiction. In <u>Santa Clara Pueblo</u>, the Supreme Court, despite finding no immunity, found a lack of subject matter jurisdiction. Subject matter jurisdiction in that suit was claimed under the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301-1303. Assessing the factors enumerated in <u>Cort v. Ash</u>, 422 U.S. 66 (1975), the Court found that this statute did not provide for an implied right of action. <u>See</u> 436 U.S. at 60-66.

The federal courts do not have jurisdiction to entertain routine contract actions involving Indian tribes. <u>See</u> <u>Gila River Indian Community v. Henningson, Durham & Richardson</u>, 626 F.2d 708 (9th Cir. 1980); <u>Mescalero Apache Tribe v. Martinez</u>, 519 F.2d 479 (10th Cir. 1975). Nor can the possibility that the Tribe might invoke § 81 as a defense to TTEA's action confer federal jurisdiction. Under the well-pleaded complaint rule, an anticipatory federal defense is insufficient for federal jurisdiction. <u>See, e.g.</u>, <u>Louisville & Nashville R. Co. v. Mottley</u>, 211 U.S. 149, 152 (1908).

With ever duller prospects, TTEA claims subject matter jurisdiction under the federal declaratory judgment statute, 28

6

U.S.C. § 2201. The declaratory judgment statute offers no independent ground for jurisdiction. Rather, it permits the award of declaratory relief only when other bases for jurisdiction are present. See, e.g., Jones v. Alexander, 609 F.2d 778 (5th Cir. 1980).

To establish an independent basis for jurisdiction, however, the plaintiff need not show that it would state a claim absent the declaratory judgment statute. Rather, it may show that there would be jurisdiction over a claim again it. A leading treatise explains:

> If the Jones Company sues for a declaratory judgment that its patent is valid and being infringed by a device manufactured by Smith, the federal claim necessarily appears on the face of the complaint and the suit is one that Jones Company could have brought in federal court by a coercive action for damages or injunction.
>     The matter is somewhat more difficult if the suit is for a declaratory judgment that the defending party does not have a federal right. . . . [I]t now seems settled that Smith can sue for a declaratory judgment of invalidity or noninfringement.

10B Charles A. Wright et al., Federal Practice and Procedure § 2767, at 651 (1998).

This lucid explanation has a foundation, if not an unambiguous endorsement, in the jurisprudence of the Supreme Court. In Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 19 (1983), the Court noted that "[f]ederal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendants brought a coercive action to enforce its rights, that suit would necessarily

present a federal question." Ultimately, the Court found no jurisdiction in a case literally meeting this description, but on narrow grounds. Specifically, the Court, "with an eye to practicality and necessity," id. at 20, refused to allow a state to sue for a declaration that federal law did not preempt its regulations, because states "have a variety of means by which they can enforce their own laws in their own courts," id. at 21.

The Court would not have needed to reach this narrow issue if it had concluded that Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667 (1950), applied. Skelly Oil, as summarized in Franchise Tax Board, "has come to stand for the proposition that if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." 463 U.S. at 16. The Court thus found Skelly Oil "not directly controlling." Id. at 15. The reason it presumably was not controlling is that in Franchise Tax Board, the declaratory defendant would have had an action under federal law. The reasoning in and structure of Franchise Tax Board thus strongly suggest that the Court's allusion to federal district courts' taking jurisdiction in such circumstances was approving. Leading commentators come to the same tentative conclusion. See Richard H. Fallon et al., Hart and Wechsler's The Federal Courts and the Federal System 946 (4th ed. 1996).

TTEA's task then is to point to a federal claim against it by the Tribe. The general grant of jurisdiction over suits brought by

8

tribes, 28 U.S.C. § 1362, adds nothing to our immediate question. Under § 1362, "[t]he district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." The "arising under" language is same as that found in 28 U.S.C. § 1331, the general grant of federal question jurisdiction.

## C.

TTEA's best hope is § 81 itself. If § 81 gave the Tribe a right to sue TTEA, we would hold that TTEA could sue for declaratory judgment that the Tribe stated no claim. The story, though, is not so simple. Section 81 specifies an unusual mechanism for enforcing its provisions. It is a qui tam suit "in the name of the United States in any court of the United States," with one-half of proceeds going to the Treasury for the tribe's benefit. See, e.g., Creek Nation v. United States, 93 Ct. Cl. 1, 11 (1941) (interpreting 25 U.S.C. § 81). We see little to support a judicial judgment that Congress intended other means of enforcement or protection. A tribe thus could not sue under § 81 except as a relator on the same terms as any other plaintiff.

The question thus arises: Can the Tribe be a proper declaratory judgment defendant when the plaintiff technically would be the United States in a § 81 action? The role of the United States under § 81 is central to the policy it enforces. The

9

statute is unabashedly paternalistic, protecting Indians from ill considered contracts. It is unsurprising that its enforcement mechanism is equally paternalistic, using the intermediary of the government to protect Native Americans thought unable to protect themselves. We may wince at this statutory design today, but we cannot craft it anew.

The statute reflects the trust relationship between tribes and the federal government. See generally American Indian Law Deskbook 8-12 (2d ed. 1998) (discussing the trust relationship). The federal government presumably would have a fiduciary duty with respect to its portion of the funds recovered. Cf. Navajo Tribe of Indians v. United States, 624 F.2d 981, 987 (Ct. Cl. 1980) ("[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties . . . even though nothing is said expressly in the authorizing or underlying statute . . . .").

But this does not make the invocation of the United States's name a mere formality. Indeed, in a recent case involving § 81, the Seventh Circuit rejected a standing challenge based on the non-Indian relators' having no connection whatsoever with the contracts, because the United States was the plaintiff, and it had standing. See United States ex rel. Hall v. Tribal Dev. Corp., 49

10

F.3d 1208, 1211-15 (7th Cir. 1995);[1] cf. United States ex rel. Mosay v. Buffalo Bros. Management, Inc., 20 F.3d 739 (7th Cir. 1994) (holding that tribal members may sue as relators). Congress wished to protect tribes by aligning them with the federal government in court and supporting them with an army of federal relators. We cannot allow evasion of this protection by permitting TTEA to sue the Tribe for a declaratory judgment under § 81, when the Tribe could not even bring an action in its own name under that section.

## III

Independent of the issue of the district court's jurisdiction over TTEA's attempt to secure a ruling on § 81, it has (and, on appeal, we have) subject matter jurisdiction to determine whether the tribal court was improperly exercising jurisdiction over the §

---

[1]The Supreme Court has granted certiorari on the question whether the federal government's power to sue state courts in federal court notwithstanding the Eleventh Amendment, cf. United States v. Mississippi, 380 U.S. 128, 140 (1965), is transferable to qui tam relators acting in its name. See United States v. State of Vt. Agency of Natural Resources, 162 F.3d 195 (2d Cir. 1998), cert. granted, 119 S. Ct. 2391 (U.S. June 24, 1999) (No. 98-1828). Even Judge Weinstein, who dissented from the panel opinion, did not dispute that a relator can have standing to sue on behalf of the United States. See id. at 224 (Weinstein, J., dissenting) ("[T]he notion of a qui tam relator 'standing in the shoes of' the United States may be sufficient to confer standing"). This, however, may be because he was bound by prior circuit precedent. See United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148, 1154 (2d Cir. 1993).

In any event, neither the standing nor the sovereign immunity issue is directly relevant here. If the Supreme Court's decision rendered § 81 incapable of enforcement in federal courts, that would only solidify our holding that the courts do not have jurisdiction to grant TTEA declaratory relief.

11

81 claim. In <u>National Farmers Union Insurance Co. v. Crow Tribe of Indians</u>, 471 U.S. 845, 852 (1985), the Supreme Court held that "whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of a tribal court is . . . a 'federal question' under § 1331." It thus affirmed the district court's conclusion that its jurisdiction was properly invoked under § 1331 to determine "whether a tribal court has exceeded the lawful limits of its jurisdiction." <u>Id.</u> at 853.

## A.

Before we can reach this jurisdictional issue, however, we must consider whether the district court should have abstained from evaluating the tribal court's jurisdiction, because TTEA has not yet exhausted tribal remedies. The Supreme Court has found that a federal court should "stay[] its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made." <u>Id.</u> at 857 (footnotes omitted); <u>see also</u> <u>Iowa Mut. Ins. Co. v. LaPlante</u>, 480 U.S. 9, 17 (1987) (noting that the tribal appellate courts should initially be permitted to review the tribal trial court's rulings).

The exhaustion rule is prudential rather than jurisdictional. <u>See</u> <u>Strate v. A-1 Contractors</u>, 117 S. Ct. 1404, 1412 (citing <u>Iowa Mutual</u>, 480 U.S. at 20 n.14). Thus, if the tribal courts have already fully reviewed the jurisdictional issue, the federal court need not hold off review until after an assessment of damages in a subsequent trial phase. In <u>Iowa Mutual</u>, the record revealed that

12

appellate review remained available.  See 480 U.S. at 17 (citing the appellate review section of the applicable tribal code).  The record in this case does not include a copy of the tribal code that would permit assessment of whether further tribal court review of the jurisdictional determination is possible.

Ordinarily, we might assume that postjudgment appellate review remains available in the tribal courts, but TTEA has already filed what it labeled as an "appeal" challenging subject matter jurisdiction.  That motion was denied by the same judge who issued the initial order.  Absent any reason to believe that TTEA could appeal the jurisdictional determination once again at the conclusion of the damages proceeding, we hold that the district court properly chose not to abstain from assessing the tribal court's jurisdiction.

B.

A tribal court generally does not have jurisdiction over non-Indian defendants.  See Montana v. United States, 450 U.S. 544, 565 (1981).  There is, however, an important exception.  A tribe may regulate the activities of nonmembers who enter consensual relationships with the tribe or its members through commercial dealing, contracts, leases, or other arrangements.  See id. at 565-66; see also Strate, 117 S. Ct. at 1415.  The cases that the Supreme Court has cited as illustrating this exception do not include any contractual arrangements between the tribe and a nontribal party, such as the one here.  Nonetheless, this case fits

13

so squarely within the Supreme Court's delineation of the exception, which is phrased to cover "consensual relationships with the tribe or its members," id. (emphasis added), that it must be applicable here.

A tribal court therefore ordinarily would have jurisdiction over this transaction. However, the civil jurisdiction of the tribal courts can be limited by congressional act. See, e.g., Iowa Mutual, 480 U.S. at 18 (noting that civil jurisdiction over non-Indians on reservation lands "presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute"). TTEA does not argue that § 81 itself abrogates tribal jurisdiction, and for good reason. The enforcement mechanism states that a relator "may" bring an action in a court of the United States, but does not explicitly create exclusively federal jurisdiction. In Charles Dowd Box Co. v. Courtney, 368 U.S. 502 (1962), the Supreme Court refused to find exclusively federal jurisdiction in a similarly worded statute. Section 81 thus does not overcome the presumption of concurrent state (and here, tribal) jurisdiction.

TTEA, however, submits that the Restoration Act, 25 U.S.C. §§ 1300g to 1300g-7, which deals directly with the Ysleta Tribe, abrogates tribal jurisdiction. Specifically, it cites § 1300g-4(f), which provides, "The State shall exercise civil and criminal jurisdiction within the boundaries of the reservation as if such

14

State had assumed such jurisdiction with the consent of the tribe under sections 1321 and 1322 of this title."

The Tribe's claim is that the mandatory "shall exercise" language imports exclusive state jurisdiction, leaving the tribal courts no role at all. To assess this contention, we must examine 25 U.S.C. § 1322:

> The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

§ 1322(a). We must ask whether § 1300g-4(f) deprives the tribal courts of jurisdiction over generally applicable contract law, and, if so, whether § 1322 applies to actions involving tribes, or only actions involving Indians.

We conclude that § 1300g-4(f), through § 1322(a), does not deprive tribal courts of concurrent jurisdiction over such matters. A treatise on Indian law explains by discussing Public Law 83-280, 67 Stat. 588 (1953), which established the original version of what is now § 1322(a):

> The civil law provisions of Public Law 280 expressly preserve the legislative authority of tribes where not

15

> inconsistent with applicable state civil law. The wording of the section shows that its purpose is to require that such tribal laws be recognized in state courts, but nothing in the wording of either the civil or criminal provisions of Public Law 280 or its legislative history precludes concurrent tribal court authority. The basic intent of the criminal law section was to substitute state for federal jurisdiction under the Indian Country Crimes Act and the Indian Major Crimes Act. [Because] these two statutes do not preclude concurrent tribal jurisdiction, neither should Public Law 280.

Felix Cohen, Handbook of Federal Indian Law ch. 6, § B4, at 344 (1982); see also Walker v. Rushing, 892 F.2d 672, 675 (8th Cir. 1990) (following this analysis in allowing concurrent tribal criminal jurisdiction); Confederated Tribes of the Colville Reservation v. Superior Court, 945 F.2d 1138, 1140 n.4 (9th Cir. 1991).

The amendments to Public Law 280 served only to increase tribal autonomy by requiring tribal consent before a state could assume concurrent jurisdiction. See generally S. REP. NO. 721, 90th Cong. (1968), reprinted in 1968 U.S.C.C.A.N. 1837, 1865-66. Though the Restoration Act obviates this consent requirement, it cannot be read as establishing exclusive state jurisdiction. We are aware that the Tenth Circuit recently concluded that a statute which similarly gave states jurisdiction "as if" through § 1322 provided jurisdiction exclusive of federal involvement. See United States v. Burch, 169 F.3d 666, 669 (10th Cir. 1999). As Professor Cohen's reasoning demonstrates, however, this does not mean that state court jurisdiction under Public Law 280 is exclusive of tribal

16

jurisdiction.  We thus find that the tribal court did not violate federal law in exercising subject matter jurisdiction.

IV

In sum, we hold that the federal district court correctly concluded that it has no jurisdiction to entertain TTEA's action on the contract against the Tribe.  The district court erred in refusing to examine the tribal court's jurisdiction under the Restoration Act, but TTEA's action for injunctive relief against the tribal court should have been dismissed anyway, for failure to state a claim.  For TTEA, all may not be lost; we take no position on the deference due the judgment of the tribal court in collection proceedings in state or federal court.

Our conclusion, though flowing from principles of tribal sovereignty, could make it more difficult for tribes to find entities willing to contract with them.  Yet we recognize that tribes can, like Ulysses, tie their hands to the mast and thus resist the sirens.  Sovereign immunity can be waived, and the federal and state courts await to resolve disputes if tribes' contractual partners insist on such protection.

AFFIRMED.