**Margaret Brush CONLEY, et al., Appellants,**

v.

**COMSTOCK OIL & GAS, LP, et al., Appellees.**

No. 09–10–00522–CV.

Court of Appeals of Texas, Beaumont.

Submitted July 7, 2011.

Decided Dec. 15, 2011.

See also 192 S.W. 316, 15 S.W.3d 666.

Andy Taylor, Amanda Peterson, Andy Taylor & Associates, Houston, Dan Miller, Paul R. Tough, Eno Peters, McElroy, Sullivan & Miller, Austin, for appellants.

J. Robert Beatty, Bryce Quine, Brandon Benson, Locke Lord Bissell & Liddell, Dallas, Stacy Williams, Locke Lord Bissell & Liddell, James D. Thompson, III, Gwen J. Samora, Matthew Johnson, Vinson & Elkins, Houston, Michael J. Truncale, Orgain, Bell & Tucker, Beaumont, Shelly Sitton, Gene Bush Law Firm, Livingston, for appellees.

Before McKEITHEN, C.J., KREGER and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

This case concerns a dispute over the location of the Bartolo Escobeda Survey and the ownership of the minerals being produced by oil and gas wells being operated by Comstock Oil & Gas, LP. One of the defendants in the trial court is an Indian tribe that is immune from suit in state court. As to the remaining defen-

dants, we affirm the trial court's summary judgment that the plaintiffs take nothing.

Margaret Brush Conley and the other plaintiffs (collectively "Conley") claim ownership of minerals allegedly severed from the surface estate of the Escobeda Survey early in the twentieth century. Conley sued Comstock Oil and Gas, the registered operator of three wells in the Hamman Unit,[1] along with landowners who granted leases to Comstock and who claimed ownership in the minerals under the tracts where the wells are located (collectively "Landowners").[2] The Alabama–Coushatta Tribes of Texas ("Tribe") is one of the landowners claiming an interest in the minerals that Conley contends lie beneath the Escobeda. The Tribe filed a plea to the jurisdiction based on tribal sovereign immunity.

Conley alleged that the tracts on which Comstock drilled the Hamman Wells are claimed by the Landowners but lie within the boundaries of the Escobeda, which survey was filed in 1835 and is senior to the surveys under which Comstock and the Landowners are alleged to claim their interests. Conley claims that Comstock produced hydrocarbons illegally and converted Conley's minerals. Conley petitioned the trial court to determine the boundary of the Escobeda in relation to the Thomas Colville and L.T. Hampton Surveys and to declare that Conley properly held the minerals under the tracts where the three Hamman Wells were drilled and all production from the wells has been illegal. After denying the Tribe's plea to the jurisdiction, the trial court ruled in favor of Comstock and the Landowners on cross-motions for summary judgment and en-

tered judgment that Conley take nothing. Conley and the Tribe appealed.

### Tribal Sovereign Immunity

■■■ In their sole issue, the Tribe argues that the trial court erred in denying their plea to the jurisdiction because the doctrine of tribal sovereign immunity required the trial court to dismiss all of Conley's claims against the Tribe for want of jurisdiction. "As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). Tribal immunity extends to governmental and commercial activities occurring on or off of the reservation. *See id.* at 760, 118 S.Ct. 1700. In support of their claim for jurisdiction, Conley relies upon two Fifth Circuit cases that hold tribal immunity will not preclude a suit in federal court for declaratory or injunctive relief. *See Comstock Oil & Gas Inc. v. Alabama & Coushatta Indian Tribes of Tex.,* 261 F.3d 567, 570–72 (5th Cir.2001); *TTEA v. Ysleta Del Sur Pueblo,* 181 F.3d 676 (5th Cir.1999). In *TTEA,* the Fifth Circuit held that the federal district court had jurisdiction over a declaratory judgment action in a contract dispute between an oil company and a federally recognized Indian tribe. *TTEA,* 181 F.3d at 680–81. In *Comstock,* the Fifth Circuit affirmed the trial court's ruling that the oil companies were not required to exhaust their remedies before a tribal court that had not been created in accordance with federally mandated procedures. *Com-*

---

**1.** The Hamman Unit consists of a 280–acre tract in the I. & G.N.R.R. Co. Survey, a 280–acre tract in the J. Bright Survey, a 40–acre tract in the Rowe and Drew Survey, and a 50–acre tract and 54–acre tract in the Nash Survey.

**2.** The trial court's judgment identifies the many plaintiffs and defendants by name, but for the sake of brevity we do not repeat their names here.

*stock,* 261 F.3d at 575. The Fifth Circuit also reversed the trial court's ruling that the Tribe was entitled to immunity from the oil company's suit for declaratory judgment, where the oil companies sought declaratory relief regarding the validity of oil and gas leases that had not been approved by the Secretary of the Interior. *Id.* at 569, 571–72, 575. Additionally, the Fifth Circuit recognized that the declaratory judgment statute offered no independent ground for jurisdiction. *Id.* at 573 n. 5; *see also TTEA,* 181 F.3d at 681 (concluding that the declaratory judgment statute did not provide an independent ground for jurisdiction).

Relying upon the *TTEA* and *Comstock* holdings that tribal immunity applies only to an award of damages, Conley asserts that the Tribe lacks immunity from a suit for a declaratory judgment to establish the boundaries of the Escobeda and Conley's superior title to the minerals. The declaratory judgment statute permits a declaratory judgment action to establish a boundary line. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.004(c) (West 2008). Although Conley presents this claim as one regarding a boundary line between the Escobeda and the Colville and Hampton Surveys, Conley is not suing the owners who are claiming minerals pursuant to title derived from the Colville and the Hampton. That litigation was resolved in a previous suit. *See Kilgore v. Black Stone Oil Co.,* 15 S.W.3d 666 (Tex.App.-Beaumont 2000, pet. denied); *see also W.T. Carter & Bro. v. Collins,* 192 S.W. 316 (Tex.Civ.App.-Beaumont 1916, writ ref'd). Conley's pleadings allege that the Landowners in this suit claim title to the minerals through surveys other than the Colville and the Hampton. This is a suit, not to resolve a boundary dispute, but to determine right to possession of certain real property.

■■■ Conley concedes the claim is for trespass to try title. *See* Tex. Prop.Code Ann. § 22.001 (West 2000). A trespass to try title action against the State requires legislative consent. *See State v. Lain,* 162 Tex. 549, 349 S.W.2d 579, 582 (1961); *see also Porretto v. Patterson,* 251 S.W.3d 701, 707–08 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (distinguishing a takings claim from a trespass to try title action). "The central test for determining jurisdiction is whether the 'real substance' of the plaintiff's claims falls within the scope of a waiver of immunity from suit." *Tex. Parks & Wildlife Dep't v. Sawyer* 354 S.W.3d 384, 389 (Tex.2011) (not yet released for publication). A suit concerning rival claims to the same property is not a boundary dispute. *Id.* Regardless of the procedural vehicle presented by the plaintiffs, the claims asserted by Conley could not be brought against the State absent legislative consent. *See id.*

■ The Tribe is not the State, but it is a domestic dependent nation under federal control. *See Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). "[T]ribal immunity is a matter of federal law and is not subject to diminution by the States." *Kiowa Tribe,* 523 U.S. at 756, 118 S.Ct. 1700. Assuming for the sake of argument that a suit for declaratory judgment would present a federal question on which the Tribe could be sued in federal court, as occurred in *Comstock,* Conley has not identified a federal or tribal waiver of immunity in this case. *Cf. Comstock,* 261 F.3d at 574–75. We sustain the Tribe's issue.

### Conley's Motion For Partial Summary Judgment

Conley's first issue contends the trial court erred in denying Conley's motion for partial summary judgment. According to

Conley, the boundaries of the Escobeda were judicially determined in a previous case brought by Conley and by another case brought by the surface owners of the Escobeda. *See Kilgore*, 15 S.W.3d at 669; *Collins*, 192 S.W. at 317–21. Collins sued to recover the Colville league from the title holders of the Escobeda. *Collins*, 192 S.W. at 317. The jury found that the Colville and Escobeda leagues do not conflict. *Id.* Several of the corners of the Colville could be identified on the ground by the original witness trees, and the lines running out from those corners fit the calls for most of the natural objects called for in the field notes. *Id.* at 319. The surveyor made errors in the first call and in the third corner. *Id.* The surveyor also mis-designated corners of the Hampton and the Cone Surveys that were made at about the same time. *Id.* The surveyor laid out the Escobeda and the Falcon Surveys on the same day, but a literal construction of the field note calls for the surveys place them in conflict. *Id.* If the Escobeda were located on the Falcon, it would not touch a prominent feature in the calls for the Escobeda, Big Sandy Creek. *Id.* The north corner of the Hampton and the south corner of the Escobeda called for the same witness trees, and those trees could be identified on the ground; furthermore, all parties agreed that the beginning call for the Escobeda in such survey should be ignored. *Id.*

In *Collins*, the title holders of the Escobeda agreed that the starting point for the Escobeda should be the north corner of the Hampton, as the jury was instructed, but they argued that the calls should be taken literally from that point, which would place the Escobeda in conflict with the Colville. *Id.* at 319–20. A re-survey of the Escobeda in 1860 located none of the original witness trees other than the north corner of the Hampton. *Id.* at 320. That survey found a marked line, and this marked line was coincident with either the east line or the west line of the Escobeda. *Id.* The parties agreed that this line is the only line of the Escobeda that was actually surveyed when the league was originally laid out. *Id.* The Escobeda title holders argued that the surveyor mistook Bear Creek for Big Sandy Creek, while the Colville title holders argued that the third course call should be reversed and substituted for the fourth course call to make Big Sandy Creek as found on the ground fit the call for course and distance in the field notes. *Id.* By the estimation of the Colville title holders, two lines of the league were located and the league could be completed by applying the calls for course and distance in the field notes. *Id.* at 321. This court held that the evidence supported the jury's finding that the Colville and the Escobeda do not conflict. *Id.*

In *Kilgore*, the purported owners of the mineral interest in the Escobeda urged the same conflict between the Escobeda and the Colville that had been resolved for the surface owners in *Collins*. *Kilgore*, 15 S.W.3d at 668. This court held that *Collins* established the boundary lines for the Colville, Thompson, and Wylie Surveys, and that stare decisis precluded the appellants from asserting a conflict between the Escobeda and those three surveys. *Id.* at 668–69. Conley now claims the Escobeda Survey is located on the ground in conflict with different surveys than those Conley previously challenged. Thus, from as early as 1916 in *Collins* to as recently as 2000 in *Kilgore*, parties in privity with Conley claimed the Escobeda was located at a different location than Conley asserts in this case. *See id.*

The parties disagree about the effect of this prior litigation concerning the location of Escobeda, and each party contends the result of that litigation supports their claims in this case. In *Kilgore*, we applied

the doctrine of stare decisis to prevent the Escobeda's mineral interest owners from asserting a location of the Escobeda that would be contrary to that which the appellate court finally determined in *Collins*. *Id.* Conley's motion for summary judgment urged that *Collins* located the boundaries of the Escobeda to the south and east of the Colville and to the north and east of the Hampton, and that by application of the doctrine of stare decisis the location of the Escobeda has been established as a matter of law. On the other hand, Comstock's motion for summary judgment contended that Conley's claims are barred by res judicata because in *Kilgore* Conley failed to assert Conley's present claims regarding the location of the Escobeda. Comstock's predecessor, Black Stone Oil Company, was one of the defendants in *Kilgore*. *See generally Kilgore*, 15 S.W.3d at 666.

Conley relies on *Swilley v. McCain* for the proposition that the location of a boundary line will control the location of the same line in a later suit even though the first case turned upon an issue of fact or the legal conclusions of a later case are not those in the first case. 374 S.W.2d 871, 875 (Tex.1964). *Swilley* left this proposition unanswered but we applied the rule in *Kilgore*. *See id.; see also Kilgore*, 15 S.W.3d at 668. In *Kilgore*, we reasoned that the *Collins* parties and their successors had lived with the boundaries established in that case for over eighty-three years. *Id.* at 669. A closer examination of *Swilley* reveals a crucial distinction between its application in *Kilgore* and the case before us now.

*Swilley* concerned real property arising from a common predecessor in title named Zavalla. *Swilley*, 374 S.W.2d at 873. The record did not contain a deed from Zavalla to his mother, Emily Hand, but in 1854 Hand conveyed a portion of the property to George Young. *Id.* Young's heirs partitioned that property into lots in 1865, and an undivided interests in some of the partitioned lots devised to George Grozier. *Id.* In 1903, Zavalla conveyed the entire original tract to H. Masterson. *Id.* In 1905 Masterson sued Young's heirs, including Grozier. *Id.* The case against Grozier was severed and ultimately settled with Masterson recovering title to Grozier's interest on one of two lots in exchange for consideration. *Id.* Masterson's suit against other heirs of Young went to a jury, which found that Zavalla had conveyed 2,000 acres by a deed to Hand. *Id.* Holding that the jury finding was supported by the evidence, the Court of Civil Appeals affirmed the judgment of the trial court. *Id.; see also Masterson v. Harrington*, 145 S.W. 626, 629 (Tex.Civ.App.-El Paso 1912, writ ref'd). Masterson conveyed his interest in the property to Swilley, who in 1946 sued a naked trespasser, Wagers, in trespass to try title for part of the property Young's heirs had subdivided in 1865. *Swilley*, 374 S.W.2d at 873–74; *see also Wagers v. Swilley*, 220 S.W.2d 673 (Tex.Civ.App.-Galveston 1949, writ ref'd n.r.e.). Swilley's abstract of title in *Wagers* included the *Masterson* jury's finding that Zavalla deeded 2000 acres to Hand. *Wagers*, 220 S.W.2d at 675. The *Wagers* court held that although *Masterson* was not res judicata as to the defendant, under the doctrine of stare decisis a title previously determined would not be reconsidered in a case proceeding on the same state of facts. *Id.* at 676. The *Wagers* court held the superiority of Young's title had been established by *Masterson*. *Id.* As against a naked trespasser, however, Swilley was entitled to possession of the entire property sued for. *Id.* at 677. The appellate court affirmed the trial court's judgment. *Id.* at 679.

In *Swilley*, Grozier's next friend, McCain, sued Swilley for Grozier's undi-

vided interest but only issues relating to Swilley's adverse possession claims were submitted to the jury. *Swilley,* 374 S.W.2d at 872. The jury failed to find adverse possession by Swilley, but the trial court entered judgment for Swilley because the plaintiffs failed to show title in themselves. *Id.* The intermediate appellate court held that the *Masterson* and *Wagers* judgments were muniments of title and that Swilley was estopped from taking a contrary position after having successfully asserted the presumption of a deed from Zavalla to Hand in the *Wagers* case. *Id.* at 874; *see also McCain v. Swilley,* 354 S.W.2d 588 (Tex.Civ.App.-Eastland 1962).

On petition for review, the Supreme Court noted the conflict in the Courts of Civil Appeals regarding the application of stare decisis to the adjudication of a boundary line, but deferred resolving that conflict because *Swilley* concerned a jury finding that a lost deed had been executed and delivered. *Swilley,* 374 S.W.2d at 875–76. "As originally conceived and as generally applied, the doctrine of stare decisis governs only the determination of questions of law and its observance does not depend upon identity of parties." *Id.* at 875. "As a general rule the determination of a disputed issue of fact is not conclusive, under the doctrine of stare decisis, when the same issue later arises in another case between persons who are strangers to the record in the first suit." *Id.* Generally, the trier of fact must determine whether the presumption of a grant or conveyance is warranted by the evidence. *Id.* at 876. Because the superiority of the Emily Hand title was neither conclusively established nor submitted to the jury, the Supreme Court reversed the judgment of the Court of Civil Appeals and affirmed the trial court's judgment. *Id.*

■ The jury charge from *Collins* appears in the summary judgment record,

and it shows that in *Collins* the appellate court upheld the factual sufficiency of the jury's finding to the special issue of whether "the Escobeda league and the Colville league of land conflict[.]" *See Collins,* 192 S.W. at 321. *Kilgore* and *Collins* concerned the same disputed issue. *See Kilgore,* 15 S.W.3d at 668. Over the decades after *Collins* held the Colville and the Escobeda do not conflict, valuable rights accrued in reliance on the finality of the decision in that case. *See id.* at 669. A finding that the Escobeda and the Colville do not conflict is not a finding that the Escobeda and the fifteen surveys at issue in this case do conflict, even if the finding in *Collins* was supported by evidence that the Escobeda is located where Conley now claims it to be. Although the *Collins* jury considered evidence that the Escobeda was located where Conley claims it is, neither a special issue nor a judgment locating the Escobeda occurred in that case. As was the case in *Swilley,* where there was no jury finding on the superiority of Emily Hand's title, *Collins* is evidentiary but not conclusive of the issue raised in the subsequent litigation. *Swilley,* 374 S.W.2d at 875–76. An implied finding that the Escobeda is located to the south and east of the Colville and to the north and east of the Hampton is not entitled to the same level of deference as the judicial determination that the Colville and the Escobeda do not conflict. *See generally id.* We hold that the doctrine of stare decisis does not establish the location of the Escobeda as a matter of law. Accordingly, the trial court did not err in denying Conley's motion for partial summary judgment.

### Comstock's Motion For Summary Judgment

■ Comstock's motion for summary judgment urged that res judicata bars Conley's claims. The moving party in a

motion for summary judgment on a defense of res judicata must conclusively establish the following elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996). Comstock contends that the plaintiffs' claims were fully adjudicated in *Kilgore. See Kilgore,* 15 S.W.3d at 669–70. Conley concedes the Conley parties' privity with the plaintiffs in *Kilgore.* Black Stone Oil Company successfully defended a trespass to try title claim in *Kilgore. Id.* A summary judgment affidavit by the vice president for operations and chief operating officer of Comstock Resources, Inc. states that Black Stone Oil Company was merged into Comstock Oil & Gas, Inc. in March 1997. Conley argues that only Comstock would be entitled to summary judgment on this res judicata theory because no summary judgment evidence establishes that any of the other defendants in the present suit were also defendants in *Kilgore.* Finally, the parties dispute whether the claims brought in this suit "could have been raised in the first action." *Amstadt,* 919 S.W.2d at 652.

 Conley included a copy of the plaintiffs' petition from *Kilgore* in support of Conley's response to Comstock's motion for summary judgment. The *Kilgore* pleadings allege: (1) in 1984 the plaintiffs executed oil and gas leases to Black Stone covering the plaintiffs' interests in the Escobeda; (2) the proper ground location of the Escobeda is in partial conflict with the Colville and in partial conflict with the Thompson and Wylle Surveys; (3) plaintiffs own the superior title to the oil and gas in place; (4) the defendants drilled wells in the "conflict area of the Escobeda

with the Colville, Thompson and [Wylle] Surveys[.]" The plaintiffs requested declaratory judgment: (1) that the Escobeda and Colville Leagues are located on the ground in partial conflict; (2) that the Escobeda and Thompson and Wylle Surveys are located on the ground in partial conflict; (3) that because the Escobeda is the senior survey to the Colville, Thompson and Wylle Surveys to the extent of the conflict between them, plaintiffs own the superior title to the minerals produced by the defendants from the conflict area. From these pleadings, it is evident that the nature of the suit was not to locate the Escobeda, but to resolve the alleged conflict between the Escobeda and the Colville, Thompson and Wylle Surveys. Thus, *Kilgore* concerned the ownership of the minerals beneath the tracts of land to the north and west of the tracts of land that are at issue in this suit. *See Kilgore,* 15 S.W.3d at 668. Comstock failed to establish as a matter of law that the present action is "based on the same claims as were raised or could have been raised in the first action." *Amstadt,* 919 S.W.2d at 652. Accordingly, Comstock's res judicata defense will not support the summary judgment.

## Doctrine of Presumed Lost Deed

Comstock also moved for summary judgment on the ground that the long acquiescence of Conley and Conley's predecessors in the possession of the land and minerals in the fifteen surveys by Comstock and the Landowners and their predecessors establishes superior title as a matter of law by operation of the doctrine of presumed lost deed. Although the location of the Escobeda is disputed as a factual matter, for purposes of this ground for summary judgment it must be presumed that the Escobeda can be located on the ground in conflict with the fifteen surveys

under which the mineral interests of Comstock and the Landowners originate.

In *Magee v. Paul,* the Texas Supreme Court held that:

> Since it is not consistent with human experience for one really owning property of value to assert no claim thereto, but to acquiesce for a long period of time in an unfounded, hostile claim, the rule is sound which permits the inference that an apparent owner has parted with his title from evidence, first, of a long-asserted and open claim, adverse to that of the apparent owner; second, of nonclaim by the apparent owner; and third, of acquiescence by the apparent owner in the adverse claim.

*Magee v. Paul,* 110 Tex. 470, 221 S.W. 254, 256–57 (1920).

Conley argues that the doctrine of presumed lost deed is not a proper vehicle for asserting an adverse claim under a different chain of title. Conley distinguishes the doctrine of presumed lost deed from the adverse possession statutes. The doctrine of presumed lost deed or grant, which is also referred to as title by circumstantial evidence, has been described as a common law form of adverse possession. *Haby v. Howard,* 757 S.W.2d 34, 39 (Tex.App.-San Antonio 1988, writ denied); *Miller–Vidor Lumber Co. v. Schreiber,* 298 S.W. 154, 161 (Tex.Civ.App.-Beaumont 1927, writ ref'd). Its purpose is "to settle titles where the land was understood to belong to one who does not have a complete record title, but has claimed a long time." *Purnell v. Gulihur,* 339 S.W.2d 86, 92 (Tex.Civ.App.-El Paso 1960, writ ref'd n.r.e.). "The rule is essential to the ascertainment of the very truth of ancient transactions. Without it, numberless valid land titles could not be upheld." *Magee,* 221 S.W. at 257. The doctrine has been applied to establish title in a party who failed to prove title under the adverse possession statutes. *See Purnell,* 339 S.W.2d at 92.

The presumption of a grant of title "is generally one of fact and not of law." *Jeffus v. Coon,* 484 S.W.2d 949, 954 (Tex.Civ.App.-Tyler 1972, no writ). The presumption of a lost grant or conveyance may be established as a matter of law under circumstances where the deeds are ancient and the evidence is undisputed. *Howland v. Hough,* 570 S.W.2d 876, 879–80 (Tex.1978). In *Howland,* the plaintiff's chain of title showed a continuous chain of conveyances, except for a gap in the chain of title from the 1845 patent to Irvine to an 1878 deed from Hill to Meissner. *Id.* at 878. The plaintiff could not produce direct evidence of possession, but the defendant did not suggest that any purported heir or grantee of Irvine had ever asserted a claim to the property. *Id.* at 879. The Supreme Court held that "[a]lthough the presumption of a lost grant or conveyance is usually one of fact, it has been sufficiently established in this case to presume it as a matter of law because the deeds are so ancient and the evidence is undisputed." *Id.* at 879–80.

The summary judgment record in this case reveals that the Escobeda Survey was filed in 1835. Of the surveys that form the source of the Landowners' titles, one survey was filed in 1908, and the other surveys that form the source of title for Comstock and the Landowners were filed between 1847 and 1884. The controversy over the location of the Escobeda arose long ago; a document archived in the General Land Office shows that in 1860 it was suggested that the Escobeda was represented incorrectly on a map on file and that the calls in the field notes were incorrect. Although the location of the Escobeda was unsettled and other surveys were being recorded, none of the documents in

the summary judgment record indicate that anyone holding under the Escobeda chain of title asserted a claim to the land at issue here. In 1916 and again in 2000, holders under the Escobeda chain of title claimed that the Escobeda Survey was located to the north and west of the property at issue in this case. *See Kilgore,* 15 S.W.3d at 668–69; *Collins,* 192 S.W. at 317. Conley cannot dispute notice of the other surveys depicted on the map that was included in our published opinion in *Collins* and relied upon by Conley in *Kilgore* to advance a claim to the Colville. *See Kilgore,* 15 S.W.3d at 668; *see also Collins,* 192 S.W. at 318. In *Kilgore,* the title holders of the Escobeda's mineral estate were relying on that map to establish the location of the Escobeda to the north and west of the property at issue in this case. *Kilgore,* 15 S.W.3d at 668. All the while they were pursuing their claims to the neighboring land, the Escobeda's title holders were necessarily disavowing ownership of the land at issue herein. Neither *Collins* nor *Kilgore* is binding on the trial court under principles of stare decisis or res judicata, but those cases do establish that neither the surface owners nor the mineral owners in the chain of title out of the Escobeda asserted a claim to the property presently at issue before this suit commenced in 2007. The long period of time in which the Escobeda grantees were claiming the neighboring land supports a conclusion that they acquiesced in the claims of the persons who claimed title under the fifteen ancient surveys at issue in this case. Acquiescence is generally a fact issue but where "the deeds are so ancient and the evidence is undisputed" it may be established as a matter of law. *Howland,* 570 S.W.2d at 879–80. The undisputed facts in this case are that since its filing in 1835 the only efforts to assert ownership in the chain of title for the Escobeda were directed at the neighboring land and not the land that is the subject of Conley's trespass to try title suit presently. Thus, the trial court did not err in granting summary judgment on the ground that Comstock and the Landowners established their title by presumed grant.

### Adverse Possession

 Because the summary judgment does not specify the grounds relied on for the ruling, the reviewing court must affirm the judgment if any theory advanced in the motion for summary judgment is meritorious. *See Rogers v. Ricane Enters., Inc.,* 772 S.W.2d 76, 79 (Tex.1989). Comstock also moved for summary judgment on three-year, five-year, and ten-year statutes of limitations. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 16.024–.026 (West 2002). A defendant who moves for summary judgment on a claim of adverse possession must conclusively establish each element of the claim. *Thedford v. Union Oil Co. of Cal.,* 3 S.W.3d 609, 612 (Tex. App.-Dallas 1999, pet. denied). To prove adverse possession, the claimant must establish "actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." Tex. Civ. Prac. & Rem.Code Ann. § 16.021(1) (West 2002).

 The first two adverse possession claims affect only that part of the disputed land that is known as the Hamman Unit, where Comstock is operating three producing wells. To establish adverse possession under the three-year statute, the moving parties must conclusively establish that they possessed the disputed property "under title or color of title" for at least three years. *Id.* § 16.024. Conley contends the holders of title under a junior survey cannot establish "title or color of title" for purposes of the three-year statute of limi-

tations because their titles are void against the holders of the senior survey. Conley relies on a case that distinguishes patents issued before the Constitution of 1876 from those issued after ratification. *See Houston Oil Co. of Tex. v. William M. Rice Inst. for the Advancement of Literature, Sci., & Art,* 194 S.W. 413, 415–16 (Tex.Civ. App.-Beaumont 1917, writ ref'd).

■ For surveys filed prior to the Constitution of 1876, and for land certificates then in existence and filed within five years of ratification,

> if the state afterwards granted the same land to others of its citizens, and possession was acquired by them and held adversely under such grant for a period of more than three years before institution of this suit, the statute of limitations will protect their possession. This defense is available, even when the state itself has made a grant of land to different parties. Conflicting grants are necessarily implied in every invocation of the plea of the statute, and both titles can not be paramount. Each is title against the government, and valid as between the parties to it, but, relatively, they are only ranked by age. The government, by its general policy, in the enactment of the statute of limitations, has only made their relative validity dependent upon the conduct of the grantees themselves in taking and holding possession. If the junior grantee gets possession, and holds adversely for the time prescribed for limitation, it becomes secure against the invasion or claim of the elder grantee. It is true, as a matter of abstract justice, when the state has once granted a part of her public domain to one of her citizens, she has no right to grant it to another. But such double grants are frequently made by the state, not in disregard of the obligations of public faith, but for want

of correct and accurate information of the locality of the land sought to be appropriated by each grantee; and, in such cases, the statutes of limitations, as statutes of repose, must regulate the relative rights of the parties.

*Galan v. Town of Goliad,* 32 Tex. 776, 788 (1870).

As originally enacted, the Constitution of 1876 granted a five-year period for survey and return of all unsatisfied genuine land certificates and provided that "all genuine land certificates heretofore or hereafter issued shall be located surveyed or patented only upon vacant or unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the State[.]" Tex. Const. art. XIV, § 2 (repealed Aug. 5, 1969). Junior patents issued subsequent to the Constitution of 1876 were held to be void and not sufficient to support the three-year statute of limitation, but "[a]ll junior patents issued by the state of Texas on lands, where the issuance of patents had not been expressly prohibited by law, are color of title, and will support the three years' statute of limitation[.]" *Houston Oil Co.,* 194 S.W. at 416. Of the three surveys comprising the Hamman Unit, two were patented by the General Land Office before 1876 but the third was patented in 1878. Although the patent issued within five years of constitutional ratification, the summary judgment record does not reveal whether the land certificate for the I & G.N. Ry. No. 18 issued before the constitution was ratified. Thus, the party moving for summary judgment has not demonstrated that Comstock held the entire Hamman Unit under color of title for three years before the suit was filed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.024.

■ To establish adverse possession under the five-year statute, the mov-

ing party must conclusively establish that for the five year period it: (1) cultivated, used, or enjoyed the property; (2) paid applicable taxes; and (3) claimed the property under a duly registered deed. Tex. Civ. Prac. & Rem.Code Ann. § 16.025. Adverse possession of the severed mineral estate requires both drilling and production. *Natural Gas Pipeline Co. of Am. v. Pool,* 124 S.W.3d 188, 193 (Tex.2003). Comstock commenced drilling ("spudded") the Hamman No. 1 well on April 17, 2002, but ran its gas well back pressure test on October 26, 2002. Suit was filed one day less than five years after the pressure test, on October 25, 2007. The summary judgment does not conclusively establish that production commenced more than five years before this suit was filed. Comstock failed to establish adverse possession of the minerals as a matter of law under the five-year statute of limitation.

■ The motion for summary judgment on the ten-year statute of limitations applied to the entire tract that Conley alleged is contained within the Escobeda. To prevail on a motion for summary judgment based on the ten-year statute of limitations, the moving party had to show that no issue of material fact existed as to whether the property was held in peaceable and adverse possession by another who cultivated, used, or enjoyed the property. Tex. Civ. Prac. & Rem.Code Ann. § 16.026(a). "Peaceable possession of real property held under a duly registered deed or other memorandum of title that fixes the boundaries of the possessor's claim extends to the boundaries specified in the instrument." *Id.* § 16.026(c).

■ Conley argues that Comstock's summary judgment evidence that sixteen wells were drilled on what Conley alleges is the Escobeda fails to establish use of the minerals under the ten-year statute of limitations. The trial court granted leave to supplement the summary judgment record with production records of the Texas Railroad Commission. The records show that Comstock or its predecessor continuously operated producing oil and gas wells from the disputed minerals for a ten-year period prior to suit.

■ Conley concedes that a total of twenty-two wells were drilled, but contends that gaps in the production reports raise a fact issue regarding whether the Comstock was in continuous possession of the minerals for a ten year period. A temporary cessation would not break the continuity of possession if the vacancy is reasonable and the circumstances show that the claimant did not intend to abandon its claim. *See Hufstedler v. Sides,* 165 S.W.2d 1006, 1010 (Tex.Civ.App.-Amarillo 1942, writ ref'd) (crops); *Halsey v. Humble Oil & Ref. Co.,* 66 S.W.2d 1082, 1086–87 (Tex.Civ.App.-Beaumont 1933, writ dism'd) (cattle). Comstock produced the *minerals* under leases that were of record and that did not terminate, and Comstock continued operations under the leases and the wells continued to produce minerals. The real property and the production records demonstrate the continuous exercise of dominion over the disputed mineral estate required for the peaceable possession of real property for purposes of establishing adverse possession. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.021(3).

■ Conley also contends that production of the minerals does not affect the entire disputed area. "[A]n adverse possessor claiming title under a registered deed is considered to have constructive possession of *all* the land within the boundaries of his deed not under another's actual possession, if he has actual possession of any part of those lands." *Sun Operating Ltd. P'ship v. Oatman,* 911 S.W.2d 749, 758 (Tex.App.-San Antonio

1995, writ denied). Conley relies on a case in which the oil company claimed to have obtained adverse possession of minerals after the lease expired. *Hunt Oil Co. v. Moore,* 656 S.W.2d 634, 641 (Tex.App.-Tyler 1983, writ ref'd n.r.e.). The company's adverse possession of the minerals did not extend beyond the land described in the lease. *Id.* (concluding "[t]he drilling of and production from wells not located on land covered by the Hamilton–Hunt lease was not an actual adverse appropriation of the land[.]"). Here, the Landowners' and Comstock's interests are identical, not adverse. The recorded leases and Railroad Commission filings prove notice of the claim to the minerals and possession is established by drilling and production.

Comstock's adverse possession claim is limited to the property it has under lease, but the Landowners claim the minerals by virtue of a chain of title through the fifteen surveys that Conley alleges conflict with the Escobeda. The identities of the record title holders under those surveys are not at issue in this case, as Conley represented to the trial court that Conley had joined all of the parties who claim an interest under the lands described in Conley's petition. With the possible exception of the Rowe & Drew Survey, adverse possession evidently commenced prior to severance of the minerals from the surface estate. As a result, the continued possession of the surface inured to the benefit of the mineral owners. *Houston Oil Co. of Tex. v. Moss,* 155 Tex. 157, 284 S.W.2d 131, 132, 136–37 (1955) (minerals retained); *Laird v. Gulf Production Co.,* 64 S.W.2d 1080, 1083–84 (Tex.App.-Texarkana 1933, writ dism'd) (surface retained). The motion for summary judgment relied solely upon mineral production; moreover, the summary judgment may be upheld only upon issues expressly set out in the motion. Tex.R. Civ. P. 166a(c). Consequently, summary judgment would be proper only as to the real property described in the documents in the summary judgment record. Because we find that summary judgment was properly granted on the application of the doctrine of presumed grant, no reversible error is shown. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). We overrule Conley's issues.

We reverse the trial court's denial of the plea to the jurisdiction filed by the Alabama–Coushatta Tribes of Texas, and render judgment granting the plea to the jurisdiction and dismissing the cause as to the Alabama–Coushatta Tribes of Texas. We affirm the trial court's summary judgment that the plaintiffs take nothing.

AFFIRMED IN PART; REVERSED AND RENDERED IN PART.